260 F.2d 739
 104 U.S.App.D.C. 221
 James A. NOE, Harry Allsman, Raymond F. Hufft, and James A.
Noe, Jr., d/b/a James A. Noe & Company, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, Loyola
University, Intervenor.
 No. 14064.
 United States Court of Appeals District of Columbia Circuit.
 Argued June 3, 1958.
Decided Oct. 16, 1958.
 
 Mr. Warren Woods, Washington, D.C., for appellant.
 Mr. Joel Rosenbloom, Counsel, Federal Communications Commission, with whom Messrs. Warren E. Baker, Gen. Counsel, Federal Communications Commission, Richard A. Solomon, Asst. Gen. Counsel, Federal Communications Commission, and Richard W. Zwolinski, Counsel, Federal Communications Commission, were on the brief, for appelee.
 Mr. Paul M. Segal, Washington, D.C., with whom Mr. Robert A. Marmet, Washington, D.C., was on the brief, for intervenor.
 Messrs. Glenn L. Archer, Jr., and James E. Curry, Washington, D.C., filed a brief on behalf of Protestants and Other Americans United for Separation of Church and State, as amicus curiae, urging reversal.
 Before BAZELON, FAHY and WASHINGTON, Circuit Judges.
 WASHINGTON, Circuit Judge.
 
 
 1
 This appeal arises from a comparative proceeding before the Federal Communications Commission to determine which of three applicants should be awarded authority to operate a commercial television station of VHF Channel 4 in New Orleans, Louisiana. The hearing examiner recommended a grant to the Times-Picayune Publishing Company, preferring it over appellant James A. Noe & Company and over intervenor Loyola University, a Jesuit educational institution in New Orleans. The Commission, after hearing argument en banc, awarded the license to Loyola University. Each of the disappointed applicants appealed, but the appeal now before this court is that of James A. Noe & Company.[1]
 
 
 2
 The primary contention of appellant Noe is that Loyola, by reason of its connection with the Society of Jesus, is the 'representative' of an 'alien,' and is a corporation whose stock is 'voted' by 'representatives' of aliens, within the meaning of Section 310(a) of the Communications Act of 1934, 48 Stat. 1086, 47 U.S.C.A. 310(a), rendering it ineligible to hold a television license.[2]
 
 
 3
 Briefly, the record shows that the Society of Jesus is an order of Roman Catholic priests, with a total membership of some 32,000, of whom about 7,500 reside in the United States. The record also shows that Loyola is an educational corporation chartered by the State of Louisiana in 1912. It is a nonprofit, non-stock corporation; it has no shares. Its property is its own, possessed in trust for educational purposes. It is legally and financially autonomous; it does not support or receive support from the Society of Jesus in a monetary way. Under the corporate charter, its directors must be priests of the Society of Jesus attached to Loyola University. All the directors are American citizens. The head of the Jesuit religious community at Loyola-- the Rector-- is ex officio the President of the University and corporation, and a member of the Board of Directors. He is appointed as head of the religious community by the Superior General of the order-- presently a Belgian citizen residing in Rome-- on the recommendation of the Provincial Superior, the head of the New Orleans Province of the Society. The Rector has the power to appoint one to three members of the Board of Directors and to submit a list of names to the Provincial Superior, from which list the latter appoints the other three leaders of the religious community, who ex officio become officers of the corporation and members of the Board. Transfers and assignments of priests belonging to the religious community at Loyola, with the exception of the Rector, are controlled by the Provincial Superior, who is an American citizen.
 
 
 4
 In support of appellant Noe's position language is cited from our opinion in WOKO, Inc., v. Federal Communications Commission, 1946, 80 U.S.App.D.C. 333, 338, 153 F.2d 623, 628, to the effect that Section 310(a) was directed against 'corporations which have an alien tinge.' Furthermore Noe contends that, on the basis of the Commission's opinion in Kansas City Broadcasting Co., 5 Pike & Fischer R.R. 1057 (1952), the purpose of the section is 'to safeguard the United States from foreign influence in the field of radio. * * *' Id. at 1093. The emphasis that the appellant places on 'alien tinge' and 'foreign influence' is misplaced, however. In a letter of March 22, 1932, to the Chairman of the Senate Interstate Commerce Committee, the Secretary of the Navy stated that--
 
 
 5
 'The lessons that the United States had learned from the foreign dominance of the cables and the dangers from espionage and propaganda disseminated through foreignowned radio stations in the United States prior to and during the war brought about the passage of the Radio Act of 1927 (superseded by the Communications Act of 1934), which was intended to preclude any foreign dominance in American radio. * * *'
 
 
 6
 Quoted in Hearings on H.R. 8301 Before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess. 26 (1934). In these same hearings, Captain Hooper, Director, Communications Division, office of Naval Operations, remarked that--
 
 
 7
 'Due to the lessons of the World War, the Navy Department * * * recommended Government ownership of all radio. Congress did not approve this, but in lieu thereof enacted legislation requiring private ownership and operation, with positive assurance that radio would be owned by United States citizens, that directors and officers of radio companies would be United States citizens, and that four fifths of the stock would be in the hands of United States citizens. * * *'
 
 
 8
 Id. at 23. See also S.Rep.No. 781, 73d Cong., 2d Sess. 7 (1934). From this legislative history we may conclude that although Section 310(a) was directed against alien control of our communications facilities, this limitation was primarily based 'upon the idea of preventing alien activities against the Government during the time of war.' 68 Cong.Rec. 3037 (1927). The relationship of Loyola to the Society of Jesus hardly seems to endanger our national security. Certainly the mere fact that the Rector is appointed by an ecclesiastical superior who is an alien is not enough to bring Loyola within the interdiction of the cited statute.
 
 
 9
 We recognize that the Society of Jesus is an hierarchical organization, and that within the organization some power and control is vested in persons who are not directly a part of the University or the corporation, and a few of whom reside abroad. But the record shows that this hierarchical chain of authority-- which extends from the Superior General in Rome to the Provincial Superior and the Rector, and in some rare situations might include the Pope-- has never been used in the past to impinge upon the independence of the University in the operation of its radio station. Under all the circumstances, even if Section 310(a) be thought to have a semblance of relevance to the present case, it nevertheless would be inapplicable since it was incorporated in the Communications Act to 'guard against alien control and not the mere possibility of alien control.' S.Rep.No. 781, 73d Cong., 2d Sess. 7 (1934). In sum, therefore, we find nothing in the legislative history of the statutory provisions, or in the record of the present case, which would require us to overrule the Commission's rejection of Noe's argument. Loyola seems to us to fall neither within the letter nor the spirit of the statute.
 
 
 10
 Turning to other aspects of the case, we note that the chain of authority within the Society of Jesus, described above, is primarily an ecclesiastical one, though it includes the power to appoint and promote. This latter power, in business organizations, might perhaps require all persons in positions of comparable appointing authority to be considered as principals in an application for a TV license, though that issue is not now before us. See WLOX Broadcasting Co. v. Federal Communications Commission, 1958, 104 U.S.App.D.C. , 260 F.2d 712. The officers and directors of Loyola are not men of business; they are leaders of a religious community. In previous comparative hearings, the Commission has always recognized the necessity of distinguishing non-business organizations from the ordinary stock corporation. See Toledo Blade Co., 15 Pike & Fischer R.R. 739, 816 (1958) (non-stock non-profit trade union ownership of corporation); City of Jacksonville, 12 Pike & Fischer R.R. 113, 180r (1956) (municipal corporation); Gulf Coast Broadcasting Co., 10 Pike & Fischer R.R. 779 (1954) (Baptist General Convention of Texas); Kansas City Broadcasting Co., supra at 1079-80 (Reorganized Church of Jesus Christ of Latter Day Saints); cf. Port Arthur College, 14 Pike & Fischer R.R. 1234, 1253-54 (1957) (college controlled by Board of Trustees). We therefore see no impropriety in the Commission's differentiating the educational and religious organization involved in the present case from the usual business corporation, in applying its customary comparative criteria.
 
 
 11
 The briefs of appellant and the amicus make reference to Loyola's failure initially to provide time on the programs of its radio station, WWL, for local Protestant clergymen. Amicus quotes from a recent papal encyclical to the effect that television programs should not contain anything 'which is contrary to the Catholic faith,'[3] and concludes that Loyola's actions together with the encyclical indicate a conscious anti-Protestant policy. It argues that the awarding of the TV license will therefore violate the First Amendment. We note, however, that at the time when Station WWL failed to provide time for local Protestant clergymen, it nevertheless carried a one-hour network program on Sunday morning which was utilized by Protestant clergymen elsewhere. Furthermore, the Commission found that this failure to provide time for local Protestant clergymen was not the result of a policy of not making such time available, and that time was provided as soon as the situation was brought to the attention of Loyola's President. The fact that Loyola is a Catholic University is not an independently significant factor for comparative consideration. Cf. Toledo Blade Co., supra at 830-31 (1958) (applicant almost wholly owned by trade union groups). The religious orientation of a licensee is an irrelevant factor. As the Commission has held, the prime consideration is 'whether the applicant, whatever his own views, is likely to give a 'fair break' to others who do not share them.' WBNX Broadcasting Co., 12 F.C.C. 837, 841, 4 Pike & Fischer R.R. 242, 248 (1948). The license which is here at stake, and which has been granted to Loyola, is a license to operate a commercial television station, in competition with other commercial stations. The programs which Loyola has informed the Commission it intends to offfer are comparable to those generally offered by other commercial stations. The Commission has satisfied itself, on an adequate record, that Loyola will fulfill the broadcast needs of the community. Under these circumstances there can be no First Amendment objection that would constitute a bar to the grant of a license to Loyola. See Kansas City Broadcasting Co., supra at 1095-96. Of course should Loyola in the future fall short of the rules and regulations of the Commission in regard to proper programming, the Commission may always review the matter in a renewal proceeding or otherwise. See Trinity Methodist Church, South v. Federal Radio Commission, 1932, 61 App.D.C. 311, 62 F.2d 850, certiorari denied, 1933, 288 U.S. 599, 53 S.Ct. 317, 77 L.Ed. 975.
 
 
 12
 The brief of amicus curiae also urges that Loyola is an 'instrumentality of the Holy Roman Pontificate,' and that the latter is a foreign sovereignty and 'the true beneficiary of the proposed grant.' The grant, it says, would be contrary to the public policy of the United States and adverse to its sovereignty. To the extent that these contentions duplicate the arguments considered above, we need not discuss them further. To the extent that they differ from those arguments, they are unsupported in the present record, were not presented to the Commission, and are not, strictly speaking, appropriate for our consideration. Nevertheless, we have considered them. We find nothing therein which would lead us to hold that the Commission's determination of the issues before it was clearly wrong or contrary to law.
 
 
 13
 After consideration of the record presented to us-- including the examiner's recommendation, the Commission's decision, and its amended decision on reconsideration-- we are satisfied that as to each point raised by appellant Noe, the Commission evaluated the record facts within the framework of its standard comparative criteria and with proper regard to its statutory mandate. We are satisfied further that the Commission's conclusion awarding the license to Loyola was based on a careful and reasoned weighing of the various points of preference awarded between Noe and Loyola, in accordance with governing law.[4] Under the circumstances, the court will not superimpose its own evaluation of the facts to upset the balance struck by the Commission. See Tampa Times Co. v. Federal Communications Commission, 1956, 97 U.S.App.D.C. 256, 230 F.2d 224; McClatchy Broadcasting Co. v. Federal Communications Commission, 1956, 99 U.S.App.D.C. 195, 239 F.2d 15, certiorari denied sub nom Sacramento Telecasters, Inc., v. McClatchy Broadcasting Co., 1957, 353 U.S. 918, 77 S.Ct. 662, 1 L.Ed.2d 665.
 
 
 14
 No reversible error appearing, the order of the Commission will be
 
 
 15
 Affirmed.
 
 
 
 [1]
 The appeal of the Times-Picayune Publishing Company, No. 14,067, was consolidated with the instant appeal, No. 14,064, for purposes of briefing and argument. After argument, while both appeals were under advisement, the appeal of Times-Picayune was withdrawn, pursuant to an undertaking it had given to the Department of Justice in connection with an anti-trust problem, and was dismissed with the consent of the parties, by order of this court
 
 
 [2]
 The pertinent portion of the text of Section 310(a) recites:
 '(a) The station license required hereby shall not be granted to or held by--
 '(1) Any alien or the representative of any alien;
 '(2) Any foreign government or the representative thereof;
 '(3) Any corporation organized under the laws of any foreign government;
 '(4) Any corporation of which any officer or director is an alien or of which more than one-fifth of the capital stock is owned of record or voted by aliens or their representatives or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country;
 '(5) Any corporation directly or indirectly controlled by any other corporation of which any officer or more than one-fourth of the directors are aliens, or of which more than one-fourth of the capital stock is owned of record or voted, after June 1, 1935, by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or the revocation of such license.'
 
 
 [3]
 His Holiness Pope Pius XII, Encyclical Miranda Prorsus, September 8, 1957, para. 130; see id. para. 216
 
 
 [4]
 It should be added that the Commission agreed with the hearing examiner that the appellant Noe was unqualified financially. However, the Commission proceeded alternatively to consider Noe comparatively as if it were qualified. Without expressing an opinion on the position of both the Commission and the examiner that Noe was not financially qualified, we have assumed here for purposes of our decision that it was so qualified