**HARTFORD COMMUNICATIONS COM-MITTEE et al., Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION,**

**RKO General, Inc., Intervenor, Faith Center, Intervenor.**

**No. 72-1171.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 26, 1972.

Decided Aug. 14, 1972.

Mr. Robert Jay Stein, Washington, D. C., with whom Mr. Albert H. Kramer, Washington, D. C., was on the brief, for appellants.

Mr. Charles M. Firestone, Counsel, F. C. C., with whom Messrs. John W. Pettit, Gen. Counsel, and Joseph A. Marino, Associate Gen. Counsel, F. C. C., were on the brief for appellee.

Mr. Morton L. Berfield, Washington, D. C., for intervenor Faith Center.

Mr. J. Laurent Scharff, Washington, entered an appearance for intervenor, RKO General, Inc.

Before TAMM and ROBB, Circuit Judges, and CHARLES E. WYZANSKI,* Senior District Judge for the District of Massachusetts.

TAMM, Circuit Judge:

This is an appeal from an order of the Federal Communications Commission approving the assignment of television station WHCT-TV, Hartford, Connecticut, from RKO General, Inc. (hereinafter "RKO"), to Faith Center, Inc.[1] The issue posed is whether the Commission could reasonably conclude that appellants had not raised substantial and material questions of fact which would make a *prima facie* showing that Commission approval of the license assignment would not be in the public interest. Put more succinctly the issue is whether an evidentiary hearing was necessary. For the reasons set forth hereinafter we conclude no such hearing was required.

I. *The Facts*

During the period 1962–1969 RKO operated station WHCT-TV, a UHF station, in Hartford, Connecticut, as the only experimental subscription or pay television station in the country. Incur-

ring substantial economic losses, RKO converted the station to a regular commercial one. Unfortunately, WHCT's economic picture failed to improve despite its new format, accumulating operating losses in excess of one million dollars. This record of deficit operation was, at least in some measure, due to the substantial competition in the Hartford area. In addition to WHCT-TV, three other commercial and one non-commercial television stations were licensed to serve the Hartford area. All of these stations were required to provide the strongest (city) grade signal to Hartford and were required to meet the programming needs and interests of the Hartford community.[2] Finding itself in economic quicksand, RKO sought to gratuitously assign its license and facilities to Faith Center, a non-profit church corporation, which operates television station KHOF-TV, San Bernardino, California, and radio stations KHOF-FM, Los Angeles, California, and KIFM (FM), Bakersfield, California.[3]

Responding to the required filing with the Commission of an assignment application containing a scant eight sentence program proposal, appellants on July 9, 1971, petitioned to deny the proposed assignment and transfer for sundry reasons. On August 20, 1971, Faith Center amended its application, hopeful of eliminating many of the deficiencies noted by appellants. While the Commission denied appellants' subsequent request to designate the one-hundred and two page amendment a "major amendment" under its rules,[4]—a thirty-five day extension

---

* Sitting by designation pursuant to 28 U.S. C. § 294(d) (1970), but not participating in the disposition of this case.

1. Appellants also appealed from a letter-order, F.C.C. 71–995 (released September 27, 1971) addressed to Sanford Cloud, Jr., et al. attorneys for the parties. That order involved an interlocutory Commission ruling denying a request by appellants for the designation of an amendment as a major amendment. 32 F.C.C.2d 80, 22 P. & F. Radio Reg.2d 1119 (1971). In view of the fact that appellants have abandoned this issue at oral argument,

we need not reach it here. However, were we required to do so, our resolution of the issue would be adverse to appellants.

2. Primer on Ascertainment of Community Problems by Broadcast Applicants, 27 F.C.C.2d 650, 658–59 (1971).

3. The first two stations were built by Faith Center while the latter was donated to it.

4. The Commission imposes certain notice requirements upon amendments designated as "major" aimed at interesting the local public who it is hoped will assist the Com-

of time [5]—it did not require a reply to the August 20 pleadings until October 1, wherein appellants requested the Commission to deny sanction of the assignment and transfer for various grounds, all of which were rejected by the Commission. In response to appellants' allegations the Commission specifically found:

(1) That the assignee made a reasonable and good faith effort to ascertain the needs and interests of the community in accordance with Commission's *Primer on Ascertainment of Community Problems by Broadcast Applicants* [6] and had made no misrepresentations in that regard;

(2) That the assignee's program proposals did not constitute a deterioration of service;

(3) That the "religious" programming balanced against the other programs, viewed in light of the other television stations in the area, and the assignee's judgment of community needs, was not an abuse of the wide discretion afforded licensees in programming matters; and

(4) That Faith Center was financially qualified to operate the station.

In its memorandum opinion and order the Commission found no material or substantial disputed factual questions which necessitated an evidentiary hearing and accordingly granted the application for assignment of WHCT-TV. Shortly thereafter, the transfer was consummated whereupon this appeal was noted.

## II. *The Standard*

Under Section 309(d) of the Communications Act of 1934,[7] the Commission, after consideration of the pleadings and other matters which it may officially notice, is required to grant applications for licenses which fail to raise "substantial and material questions of fact" and which "would be consistent with [the public interest]." If a substantial and material question of fact is raised, or if for any reason the Commission cannot make a finding that the grant of the application will serve the public interest, section 309(e) requires the application be designated for hearing.[8] Under the statutory scheme any party in interest may file a petition to deny such an application, however, the petition must "contain specific allegations of fact sufficient to show . . . that a grant of the application would be *prima facie* inconsistent with [the public interest]." [9] Should the Commission conclude that such a showing has not been made, it may dismiss the petition to deny with "a concise statement of the reasons for denying the petition, which statement shall dispose of all substantial issues raised by the petition." [10]

■ It is clear then, that not all applications pending before the Commission must be designated for hearing.[11] If there are no factual disputes, or specific allegations [12] in the petition to deny there is no need for a hearing. Even where there are factual disputes there is no automatic hearing requirement, for "[c]ontradictory allegations and affidavits which create some possibly unresolved factual issue do not invariably necessitate an evidentiary hearing before the Commission can judge whether an assignment would be in the public

mission in consideration of the application. *See* 47 C.F.R. §§ 1.571–1.574, 1.578 & 1.580 (1972).

5. *This gave appellants as much time as they would have had if the amendment had been designated a major amendment.*

6. *See* note 2, *supra*.

7. 47 U.S.C. § 309(d) (1970).

8. 47 U.S.C. § 309(e) (1970).

9. 47 U.S.C. § 309(d)(1) (1970).

10. 47 U.S.C. § 309(d)(2) (1970).

11. West Michigan Telecasters, Inc. v. F.C.C., 130 U.S.App.D.C. 39, 41, 396 F.2d 688, 690 (1968).

12. Stone v. F.C.C., 151 U.S.App.D.C. 145, 466 F.2d 316 (1972); Hale v. F.C.C., 138 U.S.App.D.C. 125, 127, 425 F.2d 556, 558 (1970).

interest." [13]  As Judge Wilkey has recently observed, "a hearing is not required to resolve issues which the Commission finds are either not 'substantial' or 'material,' regardless of whether the facts involved are in dispute." [14]  In order to determine what is "substantial" and "material" this court must consider whether "the relevant facts were adequately presented" to the Commission and whether anything properly before the Commission suggests "that a further hearing would produce additional facts that might change the result." [15]  Furthermore, it is axiomatic that the Commission is not required to hold a hearing where the "disposition of [an] Appellant's claims [depends] not on determination of facts but inferences to be drawn from facts already known and the legal conclusions to be derived from those facts." [16]  We approach the issue *sub judice* with the knowledge that the "scope of our review is quite narrow," [17]

for the "Congress intended to vest in the FCC a large discretion to avoid time-consuming hearings in this field whenever possible, and we [should] ordinarily defer to that purpose  . . . ." [18]

### III.  *The Problems*

#### A.  *Program Proposal*

■   Appellants contend that a hearing is required to review Faith Center's allegedly "specialized," denominational programming and its alleged "diminution of service."  We respectfully disagree.

#### 1.  *Specialized programming*

A comparison of the RKO program figures [19] with those of Faith Center indicates a shift in emphasis toward religious programming, however, no abdication of the concept of diversified programming is indicated.[20]  It is for this

13.  Broadcast Enterprises, Inc. v. F.C.C., 129 U.S.App.D.C. 68, 70, 390 F.2d 483, 485 (1968).

14.  Stone v. F.C.C., note 12, 151 U.S.App. D.C. at 151, 152, 466 F.2d at 322, 323 *supra,* (footnote omitted).

15.  Capitol Broadcasting Co. v. F.C.C., 116 U.S.App.D.C. 370, 373, 324 F.2d 402, 405 (1963).  *See* Marsh v. F.C.C., 140 U.S.App.D.C. 384, 387–388, 436 F.2d 132, 135–136 (1970).

16.  Anti-Defamation League v. F.C.C, 131 U.S.App.D.C. 146, 148, 403 F.2d 169,

171 (1968).  *See* Stone v. F.C.C., note 12, *supra,* 151 U.S.App.D.C. 157, 466 F.2d 328.

17.  West Michigan Telecasters, Inc. v. F.C.C., note 11, *supra,* 130 U.S.App.D.C. at 42, 396 F.2d at 691.

18.  Southwestern Operating Co. v. F.C.C., 122 U.S.App.D.C. 137, 138, 351 F.2d 834, 835 (1965) (footnote omitted).

19.  These figures, stated by RKO in a letter to the Commission on September 25, 1970, represent a program reduction by RKO over levels previously reported.

| 20. | RKO General | Faith Center |
|---|---|---|
| *Total Weekly Hours of Operation* | 51 hours | 60 hours 30 minutes |
| *News* | 2 hours (3.9%) | 2 hours 21 minutes (3.9%) |
| *Public Affairs* | 2 hours 39 minutes (5.2%) | 4 hours 14 minutes (6.9%) |
| *Other (Exclusive of Entertainment and Sports)* | 2 hours 54 minutes (5.7%) | 29 hours 15 minutes · (48.3%) |
| *Entertainment, Sports and Miscellaneous* | 43 hours 27 minutes (85.2%) | 24 hours 40 minutes (40.9%) |

reason that we distinguish what appellants label the "format" cases where courts have found a hearing necessary.[21] In those cases [22] the proposed programming changes from a 100% classical music format deprived some portion of the listening public of programming to which it was attached and for which there was no appropriate substitute. Conversely, in the instant case the religious programming only occupies 40.8% of the air time, a total of 24 hours and 39 minutes per week, of which 10 hours is on Sunday. Furthermore, the generalized nature of Faith Center's programming and the availability of comparable viewing alternatives takes this case out of the so-called "format" cases.

### 2. Denominational Character

██ ██ Any fears that petitioners may have regarding the presentation of diverse religious points of view seem to be unfounded. Faith Center has obligated itself to a multi-denominational and multi-religious forum. For example, the proposed program schedule includes a weekly program by a Roman Catholic priest and a daily religious program to be rotated among various congregations. Furthermore, Faith Center is a long-time licensee whose past conduct is clear of any symptom of religiostenosis. Should the Commission discover any denominationalism or particular religiocentrism, it is more than equipped to handle the situation.[23] The mere fact that a licensee is a religious organization should not disqualify it from operation upon the airwaves any more than it should automatically qualify the licensee.[24] The focus of the inquiry remains the public interest. The amount of religious programming is a matter which is initially confided to the judgment of the licensee in light of the established Commission criteria and the public interest standards.[25] As the Commission has recently stated:

> Of course, consistent with our prior statements on the subject, religious organizations that are applicants for, or holders of, Commission authorizations may present sectarian programs. They can not, however, turn their backs on secular problems. For that reason, they must ascertain community problems and devote portions of their programming toward meeting those problems.[26]

This is precisely what Faith Center has done. After surveying the community, Faith Center scheduled substantial public affairs and instructional programs of secular interest dealing with unemployment, underemployment, governmental problems and topics of special interest to Black and Spanish-speaking Americans. We see no abuse of Commission authority in approving the licensee's actions.

### 3. Diminution in service.

██ Appellants' assertion that there will be a diminution in service if the as-

---

21. Citizens Committee to Preserve the Present Programming of WONO (FM) v. F.C.C., No. 71–1336 (D.C.Cir.) (Order, May 13, 1971); Citizens Committee to Preserve the Voice of the Arts in Atlanta (WGKA–FM) v. F.C.C., 141 U.S.App.D.C. 109, 436 F.2d 263 (1970); Joseph v. F.C.C., 131 U.S.App.D.C. 207, 404 F.2d 207 (1968).

22. In addition to the so-called "format" cases, appellant relies upon several other cases such as Hawaiian Paradise Park Corp., 5 F.C.C.2d 71 (1966) and LaFiesta Broadcasting Co., 6 F.C.C.2d 65 (1966). We find these cases unpersuasive since they involved either hearings of a comparative nature or programming more specialized than that which we now consider.

23. See Brandywine-Main Line Radio, Inc., 4 P. & F. Radio Reg.2d 697 (1965); Brandywine-Main Line Radio, Inc., 24 F.C.C.2d 18 (1970), reconsideration denied, 27 F.C.C.2d 565 (1971), appeal pending, No. 71–1181 (D.C.Cir.).

24. Noe v. F.C.C., 104 U.S.App.D.C. 221, 260 F.2d 739 (1958).

25. See KORD, Inc., 31 F.C.C. 85, 88–89 (1961).

26. Primer on Ascertainment of Community Problems by Broadcast Applicants, note 2, supra, 27 F.C.C.2d at 653.

signment is consummated is unfounded. Faith Center proposed a 60½ hour per week schedule, whereas RKO's report to the Commission indicated a reduction to 51 hours per week.[27] Taking Faith Center's figures, RKO would show two hours per week (3.9%) of news, Faith Center two hours and 21 minutes (3.-9%)—an increase. In public affairs programming RKO would have two hours and thirty-nine minutes per week (5.2%), Faith Center would have four hours and fourteen minutes (6.9%)—an increase. With regard to instructional programming, RKO's "total other" program category which presumably includes instructional matters would have two hours and fifty-four minutes per week (5.7%), Faith Center would have four hours and thirty-six minutes (7.-5%)—again an increase.

■ Appellants, of course, contest Faith Center's categorizations. We have examined their contentions, concluding that the Commission took a "hard look"[28] and reached the reasonable conclusion that there was nothing substantial which a hearing could add to the documents before the Commission. Even if Faith Center's categorizations were not completely accurate, the difference as asserted by appellants is not necessarily fatal. The program schedule, time or percentage of a licensee need not be identical with those of the previous licensee. The test for diminution of service is not mathematical equality, but the public interest.

B. *Financial Qualifications*

■ Appellants challenge the financial qualifications of Faith Center, asserting that a hearing is required to resolve factual questions involving the accuracy of cost projections and other data. However, their contentions are general and conclusory, lacking the statutorily required specificity. They therefore do not raise substantial and material questions of fact appropriate for a hearing. If a hearing could be invoked merely upon the assertion of financial inability then the Commission's task would indeed be a hopeless one.

■ Before examining the figures we must recall that these figures are just estimates, not balance sheets. If the figures proposed and eventually approved by the Commission appear reasonable to us, we are bound by law to affirm the Commission. Now we turn to the figures. Faith Center's acquisition cost will be zero since the station is being donated. Furthermore, many of the leases and contracts which must be assumed are terminable on thirty days notice, a fact which appellants' counsel at oral argument, in his zeal for winning, conveniently omitted. Although RKO had substantial losses, it is reasonable to conclude, as the Commission did, that in view of the dissimilarities between Faith Center's method of religious operation and RKO's methods of conventional operation, the losses based upon RKO's experience cannot be validly predicted for Faith Center. Moreover, Faith Center is an experienced broadcaster which has proposed a yearly budget of $500,000 for WHCT-TV, four times that which it budgets for its San Bernadino station. Faith Center has a resource pool of over $500,000 from which to draw, comprised of over $100,000 in marketable securities and $400,000 in a loan commitment. Furthermore, there is the likelihood of some donations and some revenue from time sales.[29] It is therefore our view, undeterred by the cases upon which appellant relies,[30] that the figures support the result the Commission reached.

---

27. On September 25, 1970 RKO notified the Commission by letter that it would be reducing its program efforts from past percentages due to economic hardship. Exhibit S at 52–53.

28. Greater Boston Television Corp. v. F. C.C., 143 U.S.App.D.C. 383, 393, 444 F. 2d 841, 851 (1970).

29. As the Commission noted, Faith Center's California television station, operated at a quarter of the estimated costs of WHCT-TV, received $116,089 in gifts and $33,667 from time sales in 1970.

30. For example, Ultravision Broadcasting Co., 1 F.C.C.2d 544 (1965), dealt with construction costs, not with donated fa-

## IV. *The Conclusion*

After a thorough review of the record, we conclude there are no substantial and material questions of fact which invoke the hearing requirement of the statute in question. The factual disputes which do exist are not of decisional importance. Appellants submitted over one hundred pages of pleadings. It is difficult to envision what a hearing could have added. Essentially, appellants do not dispute facts, but rather inferences to be drawn from those facts. They challenge not facts, but rather the Commission's judgment and policies. In closing we note that no other interested applicant has come forward to claim this license or the other available license in the Hartford area. The dispute then is whether this licensee should operate the station or no licensee should do so. While an irresponsible trustee of the airwaves is anathema, we feel the Commission made a reasonable choice in concluding Faith Center was reliable, finding approval of the assignment application to be in the public interest. Accordingly, the decision of the Commission is

Affirmed.

cilities. Sunset Broadcasting Corp., 5 F.C.C.2d 321 (1966), is also distinguished

for the same reasons, as well as the differing factual situation.