LAKEWOOD BROADCASTING SERVICE, INC., Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee,

KBTR, Inc., Mission Denver Company, Intervenors.

COLORADO CITIZENS FOR BROADCASTING et al., Appellants,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee,

KBTR, Inc., Mission Denver Company, Intervenors.

Nos. 72–1757, 72–1758.

Rehearings Denied in No. 72–1757 May 24, 1973 and in No. 72–1758 May 29, 1973.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 14, 1972.

Decided May 4, 1973.

Aloysius B. McCabe, Washington, D. C., with whom John C. Quale, Washington, D. C., was on the brief for appellant in No. 72–1757.

Thomas R. Asher, Washington, D. C., for appellant in No. 72–1758.

R. Michael Senkowski, Counsel, F. C. C., with whom John W. Pettit, Gen. Counsel, and Joseph A. Marino, Associate Gen. Counsel, F. C. C., were on the brief for appellee.

Harry M. Plotkin, Washington, D. C., with whom Gene A. Bechtel, Eric L. Bernthal and Charles J. McKerns, Washington, D. C., were on the brief, for intervenors. Ralph W. Hardy, Jr., Washington, D. C., also entered an appearance for intervenor KBTR, Inc.

Before BAZELON, Chief Judge, TAMM, Circuit Judge and HARRISON WINTER,* Circuit Judge for the Fourth Circuit.

TAMM, Circuit Judge:

These consolidated appeals are taken from a Memorandum Opinion and Order of the Federal Communications Commission [hereinafter "Commission"] granting an application for assignment of the license of radio station KBTR (AM), Denver, Colorado, and the contemporaneous denial of the appellants' Petitions to Deny the assignment. The Commission opinion is reported as Charles A. Haskell, 36 F.C.C.2d 78 (1972). The sole issue propounded in both appeals is identical to that which was before the court in Hartford Communications Committee v. FCC, 151 U.S.App.D.C. 354, 467 F.2d 408, 410 (1972): "[W]hether the Commission could reasonably conclude that appellants had not raised substantial and material questions of fact which would make a *prima facie* showing that Commission approval of the license assignment would not be in the public interest. Put more succinctly the issue is whether an evidentiary hearing was necessary." *See* 47 U.S.C. § 309(d) (1970). We find that no hearing was required.

I.

KBTR (AM), wholly owned by the late John C. Mullins since 1961, is a five kilowatt station providing twenty-four hour radio service to the Denver metropolitan area. Following several unsuccessful attempts at alternative formats the station in 1967 adopted an "all news" format, becoming the sole station in the Denver area to do so.[1] The "all news" format received heavy television promotion over a Mullins owned television station, KBTV, and considerable print media promotion through utilization of a Mullins owned billboard company. KBTR (AM) nonetheless suffered considerable financial losses totaling nearly a half-million dollars,[2] and not long after Mr. Mullins' demise the executors of his estate entered into a

---

\* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1970).

1. The other stations in the Denver area provide, *inter alia*, "top forty," "middle of the road," "classical," "easy listening," "rhythm and blues," "religious," and "country and western" formats. *See* Joint Brief of Intervenors at 22–23.

2. The cash flow figures relied upon by the Commission, 36 F.C.C.2d at 79–80, and supported by an affidavit of the vice-president of Mullins Broadcasting Co., Jt. App. at 204–07, reflect net operating losses of $338,986 for 1967, $136,063 for 1968, $120,972 for 1969, and net operating profits of $46,435 for 1970, and $20,997 for the first nine months of 1971. This re-

contract to sell the station to Mission Denver Company.[3]

. Mission Denver's proposal in its assignment application before the Commission to alter KBTR (AM)'s format to "country and western" music engendered Petitions to Deny from Lakewood Broadcasting Service, Inc., the would-be primary competitor of KBTR (AM) in the Denver "country and western" market, and Colorado Citizens for Broadcasting,[4] a citizens association whose activities are "directed to scrutinizing the performance of the broadcast media in Colorado to assure maximum public service and accountability."[5] The petitioners jointly sought a hearing on the public interest ramifications of abandoning the unique "all news" format, citing Citizens Committee v. FCC, 141 U.S.App.D.C. 109, 436 F.2d 263 (1970), and Lakewood additionally challenged the financial qualifications of Mission Denver. The Commission, in a painstakingly thorough decision, rejected the contention that a hearing was required and adjudged that the public interest would best be served by granting the assignment application.

## II.

### 1. Format Change

■■ In Citizens Committee to Keep Progressive Rock v. FCC, 156 U.S.App. D.C. ——, 478 F.2d 926 (1973), also issued today, we have analyzed at some length the ramifications of the Citizens Committee decision. Where a "signifi-

cant minority" of those whom a station is obligated to serve voice discontent over a proposed entertainment format change, the format change becomes an issue to be dealt with by the Commission in its 47 U.S.C. § 309(a) (1970) determination that the assignment comports with public interest, convenience, and necessity. Consequently, factual disputes surrounding the format change are material, and if substantial become subject to the 47 U.S.C. § 309(e) (1970) hearing requirement. In Progressive Rock we also noted, however, the limited scope of review we exercise over the Commission's hearing determination, quoting from West Michigan Telecasters, Inc. v. FCC, 130 U.S.App.D.C. 39, 396 F.2d 688, 691 (1968):

> Admittedly, the scope of our review is quite narrow; we defer to the expertise and experience of the Commission within its field of specialty and would reverse only where the Commission's position is arbitrary, capricious or unreasonable. And it is clear that the decision of when hearings are necessary or desirable to clarify issues is one which lies in the first instance with the Commission. (Citations omitted.)

Progressive Rock, supra, 156 U.S.App. D.C. at —— n. 25, 478 F.2d at 926.

All of our "format" decisions to date have involved entertainment formats.[6] In light of the special public interest in news sources, see City of Camden, 18 F. C.C.2d 412, 423 (1969), and the analogy to the entertainment decisions in this

---

sults in a cumulative net operating loss of $528,589 while operating under the "all news" format.

3. A desire to liquidate the estate's assets, a need for cash to pay taxes and debts, and the co-executors' alleged realization that "their duties and fiscal responsibilities in their fiduciary capacity required them to manage the business in an extremely conservative fashion, sometimes in a manner almost contrary to their inclinations as businessmen," brought about the contract for sale. Jt.App. at 2–3.

Mission Denver Co. is a newly formed corporation. Its parent corporation, Mission Broadcasting Co., has a forty-five

year record in the broadcasting business. Jt.App. at 164.

4. Colorado Citizens for Broadcasting was joined in its petition by several individuals, and by organizations such as the Denver Area Association of the Blind, Colorado Springs Council of the Blind, Colorado Media Project, Inc., and the National Organization for Women.

5. Jt.App. at 38.

6. See Citizens Committee to Keep Progressive Rock v. FCC, 156 U.S.App.D.C. ——, 478 F.2d 926 (1973) (progressive rock); Citizens Committee to Preserve the Present Programming of WONO (FM) v.

unusual situation where news is the "entertainment" substance of the format, we feel that the logic of *Citizens Committee* and *Progressive Rock* most certainly applies to the case at hand. A close analysis of the record reveals, however, that no substantial and material facts are at issue, and therefore that the Commission could rightly make its public interest determination as to the format change without an evidentiary hearing.

Appellants claim that interview summaries submitted to the Commission—in compliance with the requirement that the applicant consult with community leaders, evaluate community problems based on those consultations, and program accordingly [7]—were defective in that they failed to recite that many of the civic leaders interviewed favored retention of the "all news" format. Appellants additionally allege that in some instances the interviewees were not informed of the proposed format change.[8] These actions, appellants claim, raise factual questions concerning the adequacy and accuracy of the community survey which can only be resolved in an evidentiary hearing.

The Commission found appellant's assertion to be based on a persistent "misreading of the purpose of ascertainment procedures," and stated that "the purpose of interviewing community leaders is to discover community *problems, not* to elicit program preferences." 36 F.C.C.2d at 84–85. We must agree. Clearly the Primer on Ascertainment of Community Problems by Broadcast Applicants, 27 F.C.C.2d 650, 682 (1971), elucidates that the ascertainment procedures are meant to determine the problems of the community, *e. g.*, drug

abuse, pollution, race relations, crime, as opposed to the programming preferences of the interviewees.

In *Citizens Committee* we remanded for a hearing to resolve alleged discrepancies in the summaries of interviews with thirteen community leaders, and thus to determine if misrepresentation was more than just an allegation. The summaries at issue were submitted by the applicant-assignee to reflect favorable views toward the proposed new entertainment format, in an effort to offset mounting pressure being applied by citizens seeking to retain the old. To the extent that the summaries did not truly reflect the affiants' views regarding programming preferences—precisely the issue they were represented to influence—misrepresentation and appendant denial of the application were in issue. In the situation *sub judice,* however, statements of preference simply are not relevant to the ascertainment survey as presently constituted, and so the Commission's conclusion that the alleged misrepresentations regarding format preferences do not raise material issues of fact cannot be faulted. We adopt the Commission logic, 36 F.C.C.2d at 86:

> [S]ince the Primer is not concerned with community leaders' views or program preferences, there is no basis for concluding Mission tried to mislead the Commission by not including interviewee comments on format choices in the consultation reports filed with the application. Given the Primer requirements, any factual questions raised by Mission's alleged failure to inform interviewees of the format change or to include their comments on such proposal are not substantial questions, and certainly not

FCC, No. 71–1336 (D.C.Cir. May 13, 1971) (classical music) ; Citizens Committee v. FCC, 141 U.S.App.D.C. 109, 436 F.2d 263 (1970) (classical music).

7. *See* Primer on Ascertainment of Community Problems by Broadcast Applicants, 27 F.C.C.2d 650, 683–87 questions #11 through 36 (1971).

8. Appellants allege that out of the sixty community leaders resurveyed, twenty-

nine stated they had not been told by Mission of the intended format change, and only fifteen were certain they had been told. Twenty-four of the sixty allegedly "expressed views about the need to continue KBTR's format." Jt.App. at 52–53. Appellees challenge not only the relevancy of such a finding but also the methodology of the resurvey. Joint Brief of Intervenors at 36 n. 49.

the *material* questions which are required before a hearing is needed.[9]

■ Appellants additionally complain that there exist material and substantial questions of fact concerning alternative ·sources of the "all news" format [10] and the financial viability of the "all news" format.[11] It is enough to respond (without entering into a lengthy enumeration of facts and figures) that our study of the record shows that what really is being challenged is not the authenticity or accuracy of the surveys, composites, or economic reports, but rather the inferences which the Commission may draw therefrom. Certainly the "inferences to be drawn from facts already known and the legal conclusions to be derived from those facts" may be made by the Commission without an evidentiary hearing. Anti-Defamation League of B'nai B'rith v. FCC, 131 U.S. App.D.C. 146, 403 F.2d 169, 171 (1968), cert. denied, 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969).[12]

## 2. *The Financial Qualifications of Mission Denver*

■ Appellant Lakewood challenges the financial qualifications of Mission

9. In the Primer on Ascertainment of Community Problems by Broadcast Applicants, 27 F.C.C.2d 650, 679–80 (1971), the Commission points out that it was specifically "exclud[ing] a question recommended . . . relating to the showing that must be made in cases where a station proposes to change its format." It did recognize, however, that Citizens Committee v. FCC, 141 U.S.App.D.C. 109, 436 F.2d 263 (1970), necessitated "that any application involving a *substantial change in program format* . . . be scrutinized" and that "applicants should be prepared to support their proposals to change formats in light of the needs and tastes of the community and the types of programming available from other stations." *See* Citizens Committee to Keep Progressive Rock v. FCC, 156 U.S.App. D.C. at ——, 478 F.2d at 926 (1973).

The ascertainment survey is concerned with problems, not preferences and need not be the vehicle for supporting evidence regarding a program format alteration. This is especially true in light of the fact that unless a significant minority voices opposition to the format change "the Commission assumes—and properly so—that the new format is acceptable." Twin States Broadcasting, Inc., 35 F.C.C.2d 969, 974 (1972) (Commissioner Johnson, dissenting). *See Progressive Rock, supra*, 156 U.S.App.D.C. at —— n. 23, 478 F. 2d at 926. Thus the absence of any references to preference in the ascertainment survey cannot be considered a misrepresentation. If the format change does become a public interest issue, however, and surveys *et al.* are submitted by the applicant "to support [its] proposals to change formats," misrepresentations contained therein certainly become material. *See Citizens Committee, supra.* Also, should an applicant anticipate opposition and include references to program preferences in its ascertainment survey in an effort to supply videntiary support for its proposed change, hen if format change becomes a public interest issue any misrepresentations will become material. We are presented with neither of those situations.

10. The Commission found, 36 F.C.C.2d at 86, that the twenty other Denver area radio stations would provide a total of 291 hours and 39 minutes of radio news per week. *See* Jt.App. at 209–10. Two Denver area stations altered their formats to provide "all news" in prime listening hours and have increased their news staffs and news gathering facilities. The Commission concluded, 36 F.C.C.2d at 87:

[T]he plethora of news services available in Denver, the prime time "all news" services recently made available by Stations KGMC and KOA–AM, and the alternative balanced program format ·proposed by Mission all justify the format change at KBTR. In making this judgment, we do not pretend that every demonstrated listener need or interest in Denver will be perfectly met. But as suggested before, we cannot guarantee that every broadcast need will be instantly ratified on a fixed frequency twenty-four hours per day. It is unreasonable to expect this, and the Communications Act neither requires nor authorizes such a result.

11. In addition to the financial losses experienced over the past five years, *see* note 2 *supra*, increased operating expenses as a result of the disaffiliation with KBTV (sold to another buyer in compliance with the Commission's "one-to-the-market" policy), were a distinct possibility. *See* Jt.App. at 203.

12. There have been advanced glimmerings of an argument that no Commission determination of the public interest can be made absent a survey of community preferences on the issue, similar to that

Denver, citing the "staleness" and "speculative nature" of its financial submission. The applicable standard established by the Commission in Ultravision Broadcasting Co., 1 F.C.C.2d 544, 546–47 (1965), places the burden on the applicant to show that it has the financial strength to withstand the costs of purchase and the first year of operation. The Commission estimated that some $2,079,900 would thus be needed, an estimate that is unchallenged. The Commission additionally estimated that $2,224,705 (some $180,000 less than applicant-assignee's estimate) would be available from the following sources: (1) a $2,000,000 loan, the existence of which is also unchallenged; (2) $192,087 in excess of current assets over current liabilities as shown on the consolidated balance sheet of Mission Broadcasting Company, Mission Denver's parent corporation; and (3) $46,435 in estimated profit from the first year of operation of KBTR (AM). 36 F.C.C.2d at 87–88. We find, notwithstanding the fact that the figures relied upon by the Commission in its extrapolations were several months old at the time of the decision,[13] that the Commission's determinations were sound and reasonable, especially in light of the fact that only $79,000 was really in issue. Finding such, we are bound to affirm. *See Hartford, supra,* 467 F.2d at 414.

The determination of the Commission that no material and substantial questions of fact existed, and so no evidentiary hearing was required, along with its conclusion that the public interest would be served by granting the application, is supported by substantial evidence in the record and is neither arbitrary, unreasonable, nor capricious. Accordingly, the order of the Commission granting the application for assignment of KBTR (AM) and denying appellants' Petitions to Deny is

Affirmed.[14]

conducted in *Citizens Committee*. Certainly the extent of community support is an element to be considered by the Commission, but the *exact* proportions or degree of such support need not always be known prior to a reasoned determination. Here the case for allowing the format change, in view of financial considerations, alternative sources, and the broadcasting record of the assignee, was strong. The Commission had to consider the public interest, but that does not in all situations require a survey to determine the exact degree of support for the old format.

13. The statement of consolidated and retained earnings of Mission Broadcasting Co. covered a period through July 31, 1971, Jt.App. at 11, while the "Statements of Income and Expense' of KBTR (AM) were through September 30, 1971. Jt.App. at 206. The assignment application was filed on August 27, 1971. FCC Form 314, section III, item 2(a) requires that a "detailed balance sheet of assignee as of the close of a month within 90 days of the date of the application showing applicant's financial position" be filed with the assignment application. 47 C.F.R. § 1.65 requires that an amendment to the application be filed by the applicant whenever "the pending application is no longer substantially accurate and complete in all significant respects . . . . ."

14. One further note of explanation regarding our decisions in the area of the law explored today in *Progressive Rock* and *Lakewood Broadcasting* is in order. While we have recognized that format changes may impair the public's paramount interest in diversified programming, we have never attempted to set out specific guidelines for achieving the marketplace ideal. The first, tentative steps into this complex area of regulation must be taken by the Commission. The Commission, and perhaps rightly so, appears loathe to lightly undertake a task which smacks of establishing it as the "national arbiter of taste." The law in this area, following the lead of *Citizens Committee,* is in a state of transition. Whatever standards are set must remain flexible and open to new information and new understanding.

So far we have only pointed out on a case by case basis those circumstances in which the Commission must *take a closer look* at the result achieved by the give and take of the market environment and the business judgment of the licensee— and must test this result against the public interest in accommodating "all major aspects of contemporary culture." We do not here intimate any views on how the balance of competing public, and public and private, interests should be struck.