WNCN LISTENERS GUILD and Citizens Communications Center, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

American Broadcasting Companies, Inc., National Association of Broadcasters, Intervenors.

CLASSICAL RADIO FOR CONNECTICUT, INC., and Committee for Community Access, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

National Association of Broadcasters, Cornhusker Television Corp., et al., Intervenors.

The OFFICE OF COMMUNICATION OF the UNITED CHURCH OF CHRIST, et al., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Metromedia, Inc., National Radio Broadcasters Association, National Broadcasting Company, Inc., CBS, Inc., Intervenors.

Nos. 76–1692, 76–1793 and 77–1951.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 7, 1979.

Decided June 29, 1979.

---

Kristin Booth Glen, New York City, was on the brief for petitioners WNCN Listeners Guild and Citizens Communications Center in case 76–1692.

David M. Rice, Greenwich, Conn., was on the brief for petitioners Classical Radio for Conn., Inc., and Committee for Community Access in case 76–1793.

Wilhelmina Reuben Cooke, Washington, D. C., with whom Edward J. Kuhlmann, Washington, D. C., was on the brief for petitioners Office of Communication of the United Church of Christ, et al., in case 77–1951.

David J. Saylor, Deputy General Counsel, Federal Communications Commission, Washington, D. C., argued for respondents F.C.C. and the U. S.; Daniel M. Armstrong, Associate Gen. Counsel, C. Grey Pash, Jr., Counsel for F.C.C., John H. Shenefield, Asst. Atty. Gen., Robert B. Nicholson and Andrea Limmer, Attys. for Dept. of Justice, Washington, D. C., were on the brief.

M. Jason Zelin and Charles M. Firestone were on the brief for amici curiae—Classical Music Supporters, Inc., Committee for Open Media, Consumer Federation of America, Friends of WONO, Inc., and Louisiana Center for the Public Interest—in support of the petitioners and urging reversal of the order of the Federal Communications Commission.

Timothy B. Dyk and William R. Richardson, Jr., Washington, D. C., were on the brief for intervenor CBS, Inc.

Carl R. Ramey with whom James A. McKenna, Jr., Thomas N. Frohock and Gaylene J. McCartney, Washington, D. C., were on the brief for intervenor American Broadcasting Co., Inc.

J. Laurent Scharff, Washington, D. C., with whom James J. Freeman, Erwin G. Krasnow and Jack N. Goodman, Washington, D. C., were on the brief for intervenor National Ass'n of Broadcasters.

B. Dwight Perry and Richard D. Marks, Washington, D. C., were on the brief for intervenors Cornhusker Television Corp., Covenant Broadcasting Corp., Covenant Broadcasting Corp. of Louisiana, Inc., Covenant Radio of Oklahoma, Inc., Fetzer Broadcasting Co., Fetzer Television Corp., KOOL Radio-Television, Inc., KTOK Radio, Inc., McClatchy Newspapers, Medallion Broadcasters, Inc., Newhouse Broadcasting Corp., Palmer Broadcasting Co., Plough Broadcasting Co., Inc., Radiohio, Inc., Rusk Corp., WBNS–TV, Inc.

Thomas Schattenfield and Harry F. Cole, Washington, D. C., were on the brief for intervenor National Radio Broadcasters Ass'n, in case 77–1951.

Thomas J. Dougherty and Preston R. Padden, Washington, D. C., were on the brief for intervenor Metromedia, Inc.

Frank W. Lloyd, III, Washington, D. C., also entered an appearance for the petitioners WNCN Listeners Guild and Citizens Communications Center in case 76–1692.

Lloyd John Osborn and Robert Lewis Thompson, Washington, D. C., also entered appearances for the Dept. of Justice in case 76–1692.

Werner K. Hartenberger, Washington, D. C., also entered an appearance for the F.C.C. in case 76–1793.

Floyd Abrams, New York City, also entered an appearance for intervenor National Broadcasting Co. in case 77–1951.

J. Roger Wollenberg, Stephen A. Weiswasser and Neal M. Goldberg, Washington, D. C., also entered an appearance for intervenor CBS, Inc., in case 77–1951.

Before WRIGHT, Chief Judge, and BAZELON, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

Opinion for the court, concurred in by Chief Judge J. SKELLY WRIGHT, and Circuit Judges LEVENTHAL, SPOTTSWOOD W. ROBINSON, III, ROBB and WILKEY, filed by Circuit Judge McGOWAN.

Concurring opinions filed by Circuit Judges BAZELON and LEVENTHAL.

Dissenting opinion filed by Circuit Judge TAMM. Circuit Judge MacKINNON joins in Circuit Judge TAMM's dissenting opinion.

McGOWAN, Circuit Judge:

In cases culminating with *Citizens Committee to Save WEFM v. FCC*, 165 U.S.

App.D.C. 185, 506 F.2d 246 (1974) (*en banc*), this court, always in the context of the Federal Communications Commission's statutory responsibility to pass upon voluntary assignments of radio licenses, construed that responsibility as comprehending the issue of whether the proposed abandonment of a distinctive programing format was in the public interest. In particular, we said that, where a significant sector of the listening community, in opposition to the assignment, protests the loss of such a format by substantial factual allegations that it is both unique and financially viable, the statute requires that the Commission hold a hearing.

Thereafter the Commission, after notice and comment proceedings, issued a "policy statement" disagreeing with *WEFM*, arguing that the public interest in diversity of entertainment formats is best served by unregulated competition among licensees, and urging this court to repudiate the approach it has taken. *Memorandum Opinion and Order*, 60 F.C.C.2d 858 (1976) [*Policy Statement*]; 66 F.C.C.2d 78 (1977) [*Denial of Reconsideration*]. Citizens groups interested in fostering and preserving distinctive entertainment formats petitioned this court for review.* We set the case for hearing *en banc* because no panel of the court could overrule our *en banc* holding in *WEFM* as the Commission requested.[1] Unpersuaded

* Petitioners in this consolidated review proceeding are WNCN Listeners Guild and Citizens Communications Center (No. 76–1692); Classical Radio for Connecticut, Inc. and Committee for Community Access (No. 76–1793); and Office of Communication of the United Church of Christ, Mexican American Legal Defense and Education Fund, National Latino Media Coalition, National Council of La Raza, Bilingual Bicultural Coalition on Mass Media, American G.I. Forum, and Public Communication, Inc. (No. 77–1951).

Amici in support of petitioners are Classical Music Supporters, Inc., Committee for Open Media, Consumer Federation of America, Friends of WONO, Inc., and Louisiana Center for the Public Interest.

Intervenors on respondents' behalf are American Broadcasting Companies, Inc., CBS, Inc., Cornhusker Television Corporation, Covenant Broadcasting Corporation, Covenant Broad-

casting Corporation of Louisiana, Inc., Covenant Radio of Oklahoma, Inc., Fetzer Broadcasting Company, Fetzer Television Corporation, KOOL Radio-Television, Inc., KTOK Radio, Inc., McClatchy Newspapers, Medallion Broadcasters, Inc., Metromedia, Inc., National Association of Broadcasters, National Broadcasting Company, Inc., National Radio Broadcasters Association, Newhouse Broadcasting Corporation, Palmer Broadcasting Company, Plough Broadcasting Company, Inc., Radiohio, Incorporated, Rusk Corporation, and WBNS–TV, Inc.

1. *See Home Box Office, Inc. v. FCC*, 185 U.S. App.D.C. 142, 165, 567 F.2d 9, 32 (1977), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977) (*Policy Statement* constitutes "request to this court to reconsider its position in *WEFM*.")

that our reading of the Act is wrong, we decline the Commission's invitation to announce our abandonment of it.

## I

## A.

The basic premise of our format cases[2] is that the Communications Act's "public interest, convenience, and necessity"[3] standard includes a concern for diverse entertainment programing. Congress set aside the radio spectrum as a public resource and acted to secure its benefits, not only to those in the cultural mainstream, but to "*all the people*"[4] of our richly pluralistic society. It "is surely in the public interest," therefore, "as that was conceived of by a Congress representative of all the people, for all major aspects of contemporary culture to be accommodated by the commonly-owned public resources whenever that is technically and economically feasible." *Citizens Committee to Preserve the Voice of Arts in Atlanta v. FCC*, 141 U.S.App.D.C. 109, 115, 436 F.2d 263, 269 (1970).

 Congress delegated to the Commission the task of ensuring that the license grants are used in the public interest. In particular, the Commission must sometimes consider the loss of diversity (together with other factors bearing on the public interest) when deciding assignment applications involving abandonment of existing formats. It must take a "hard look" at the salient problems, including loss of diversity, when making this public interest determination. *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

 The Commission need not consider the public interest implications of format abandonment, however, when there are compelling indications that the loss in diversity is not serious or that the assignment is otherwise clearly in the public interest. For example, if notice of the change does not precipitate an outpouring of protest,[5] the Commission may properly assume that the proposed format is acceptable.[6] Similarly, even if a committed and vocal minority engages in significant public grumbling, no public interest issue is raised if their preferred format is the choice of a population segment too small to be accommodated by the available frequencies.[7] Finally, no public interest issue arises if there is an adequate substitute for the endangered format within the service area.[8] In these situations the evidence is strong that the

**2.** *Citizens Comm. to Save WEFM v. FCC*, 164 U.S.App.D.C. 185, 506 F.2d 246 (1974) (*en banc*); *Citizens to Keep Progressive Rock v. FCC*, 156 U.S.App.D.C. 16, 478 F.2d 926 (1973); *Lakewood Broadcasting Serv., Inc. v. FCC*, 156 U.S.App.D.C. 9, 478 F.2d 919 (1973); *Citizens Comm. to Preserve the Voice of Arts in Atlanta v. FCC*, 141 U.S.App.D.C. 109, 436 F.2d 263 (1970). *See also Hartford Communications Comm. v. FCC*, 151 U.S.App.D.C. 354, 467 F.2d 408 (1972).

**3.** Communications Act §§ 309(a); 310(b), 47 U.S.C. §§ 309(a); 310(b).

**4.** *National Broadcasting Co. v. United States*, 319 U.S. 190, 216–17, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (emphasis added).

**5.** *See WEFM, supra*, 165 U.S.App.D.C. at 193, 506 F.2d at 254 (over 1,000 protest letters to the Commission); *Progressive Rock, supra*, 156 U.S.App.D.C. at 18, 478 F.2d at 928 (11,000 signatures); *Atlanta, supra*, 141 U.S.App.D.C. at 111, 436 F.2d at 265 (over 2,000 signatures on protest letters and petitions).

**6.** *See WEFM, supra*, 165 U.S.App.D.C. at 201 n.21, 506 F.2d at 262 n.21; *Progressive Rock, supra*, 156 U.S.App.D.C. at 24, 478 F.2d at 934; *Lakewood, supra*, 156 U.S.App.D.C. at 14 n.9, 478 F.2d at 924 n.9.

**7.** In *Atlanta*, for example, a public interest issue was raised when 16% of the listeners in an area served by 20 radio channels preferred the "classical" format available in only one of such channels. On the other hand, we noted that a switch to the format preferred by the majority would make perfect sense if there were only one available channel. 141 U.S.App.D.C. at 115, 436 F.2d at 269.

**8.** *WEFM, supra*, 165 U.S.App.D.C. at 201–204, 506 F.2d at 262–65; *Progressive Rock, supra*, 156 U.S.App.D.C. at 19 n.6, 22, 478 F.2d at 929 n.6, 932; *Lakewood, supra*, 156 U.S.App.D.C. at 14 n.10, 478 F.2d 924 n.10; *Atlanta, supra*, 141 U.S.App.D.C. at 117–18, 436 F.2d at 271–72.

assignment will not result in a troublesome diminution of format diversity. Further, if the format itself is shown to be economically unfeasible in the particular market—*i. e.*, if even an efficiently managed station would have no realistic prospect of economic viability—then abandonment of the existing format does not contravene the public interest and the Commission need not pursue by hearing the alleged loss of diversity.[9]

■ If the record presents substantial questions of fact material to the public interest, including the public interest in diversity, the Commission must hold an evidentiary hearing.[10] However, no hearing is required when the record presents no substantial questions of material fact. If the only issues of substance are the inferences and legal conclusions to be drawn from known facts, the Commission is free to make the public interest determination and decide the application before it.[11] Even when the record otherwise presents substantial fact issues, a hearing is unnecessary if undisputed facts establish any one of those situations discussed above in which no public interest issue arises. Thus, a hearing

will rarely be needed to determine that (1) there has been no out pouring of public protest to the format change, (2) the endangered format's devotees are too few to be accommodated by the available frequencies, (3) there is an adequate substitute in the service area,[12] or (4) the format itself is financially unviable.[13]

## B.

In response to our *WEFM* decision the Commission on January 19, 1976 proposed to reexamine the format question. *Development of Policy Re: Changes in the Entertainment Formats of Broadcast Stations*, 57 F.C.C.2d 580 (1976) [*Notice of Inquiry*]. It expressed "deep[ ] concern[ ]" that *WEFM* threatened "serious adverse consequences for the public interest," *id.* at 582, and doubted that "a system of pervasive governmental regulation," *id.*, could do a better job than concededly imperfect market forces. The "quagmire" of administratively distinguishing among formats militated against regulation, as did the possibility that broadcasters, to avoid being locked in

---

**9.** *WEFM, supra*, 165 U.S.App.D.C. at 201, 506 F.2d at 262; *Progressive Rock, supra*, 156 U.S. App.D.C. at 21, 478 F.2d at 931; *see Atlanta, supra*, 141 U.S.App.D.C. at 116, 436 F.2d at 270.

**10.** Under § 309(a) of the Act, 47 U.S.C. § 309(a), the Commission must determine, with respect to a license application, whether the public interest, convenience and necessity would be served thereby and, if it so determines, must grant the application. Assignment or transfer applications are subject to the same standards and treated in the same manner, 47 U.S.C. § 310(d); *see id.* §§ 308, 309(a). Section 309(d)(1), 47 U.S.C. § 309(d)(1), provides that any party in interest may petition the Commission to deny the application, and that such petition "shall contain specific allegations of fact sufficient to show . . . that a grant of the application would be prima facie inconsistent with [the public interest, convenience and necessity]." Section 309(d)(2), 47 U.S.C. § 309(d)(2), provides:

> If the Commission finds on the basis of the application, the pleadings filed, or other matters which it may officially notice that there are no substantial and material questions of fact and that a grant of the application would be consistent with [the public interest, convenience, and necessity], it shall make the

> grant, deny the petition, and issue a concise statement of the reasons for denying the petition, which statement shall dispose of all substantial issues raised by the petition. If a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent with [the public interest, convenience, and necessity], it shall proceed as provided in subsection (e) of this section.

Subsection (e) governs the procedures for setting the application down for a hearing and notifying interested parties, and, in the case of issues presented by a petition to deny, authorizes the Commission to assign the burden of going forward and the burden of proof.

**11.** *Progressive Rock, supra*, 156 U.S.App.D.C. at 20–21, 478 F.2d at 930–31; *Lakewood, supra*, 156 U.S.App.D.C. at 14, 478 F.2d at 924.

**12.** *Lakewood, supra*, 156 U.S.App.D.C. at 14 n.10, 478 F.2d at 924 n.10. Compare *Progressive Rock, supra,* 156 U.S.App.D.C. at 22, 478 F.2d at 932.

**13.** *Lakewood, supra*, 156 U.S.App.D.C. at 11–12 n.2, 14 n.11, 478 F.2d at 921–22 n.2, 924 n.11.

to an unprofitable format, would cease experimenting with unusual programing approaches. *Id.* at 582–84. The "policy," as the Commission chose to characterize it, imposed by this court also raised questions under the First Amendment warranting "prompt and thorough review." *Id.* at 585. The Commission, in short, was "concerned that the course charted by the Court may lead only to expense, delay and stagnation, with no assurance that a decision finally reached by the Commission would be in any sense superior to (or more in the public interest than) that favored by the marketplace." *Id.* at 584.

In light of these misgivings, the Commission proposed to reconsider whether it "should play any role in dictating the selection of entertainment formats." *Id.* It solicited public comments on the statutory and constitutional considerations described above. It also invited "[p]arties who favor some degree of government involvement" to address a number of questions [14] bearing on the practical implementation of *WEFM*.[15]

Comments were filed, and on July 30, 1976, the Commission repudiated the *WEFM* decision on four principal grounds. First, *WEFM* misread the Communications Act because it imposed "common carrier-like" obligations in violation of congressional intent that broadcasters compete freely [16]

14. (a) When should the Commission become involved in format changes—i. e., in all cases or only those where there is a significant public outcry? See *Citizens Committee to Keep Progressive Rock, supra,* 156 U.S.App. D.C. at 24, 478 F.2d at 934. Also, how do you determine significant public outcry?

(b) Should the Commission attempt to categorize entertainment formats and, if so, on what basis?

(c) Other than a general objection to a proposed change in entertainment format, what burdens should be placed on members of the public to demonstrate that a unique format is being abandoned?

(d) If an applicant proposes to change from an alleged unique format, what showing is necessary to justify the proposed change? Also, if financial hardship is alleged, what showing should be submitted by an applicant justifying the losses?

(e) In cases of an alleged unique format, what consideration should be given to factors such as: (i) the similarity of other formats in the market; (ii) the population and areas served by broadcast facilities; (iii) the audience of the respective stations; (iv) the hours of operation, type of service (e. g., AM, FM, educational), and the like? Further, in hearing cases involving alleged unique formats, what should be the burdens of the respective parties?

(f) If an applicant proposes to change from one unique format to another, should a hearing be held to determine which will better serve the public interest?

(g) Should the Commission consider a change from an alleged unique format only when the station is being sold, at license renewal time, or at other times?

(h) Is the maximization of program diversity necessarily in the public interest? That is, does the maximization of entertainment formats necessarily result in the maximization of consumer satisfaction?
57 F.C.C.2d at 584–85.

15. Chairman Wiley wrote a separate statement emphasizing the subjectivity of classifying formats and criticizing *WEFM* for erecting barriers to entry to successful entertainment formats. Commissioner Robinson contributed a concurring statement expanding on the *Notice of Inquiry* and criticizing *WEFM,* in addition, for placing the entire weight of the obligation to promote diversity on the licensee planning to abandon a "unique" format.

Commissioner Hooks, in a separate concurring statement, stressed the difficulties minority audiences experience in receiving their preferred programing. In his view, *WEFM* did not demand "format allocation on a grand scale and a system of intimate monitoring." *Id.* at 589. Believing that the Commission's energies were better spent "devising tenable standards to apply rather than battling speculative aberrations," he suggested a "common sense" reading:

To determine whether a format is unique in the community, I would use only a threshold test of conspicuous generic equivalence . . . . To determine whether there is "significant grumbling" about a proposed format change, I would compare the magnitude of the protest to the magnitude of the service area using a zone of reasonableness concept. I would interpret economic feasibility as consistent with a profit comparable to the average station in the market (or like market) since I don't believe the court expects anybody to labor for less than fair recompense. *Id.*

16. The Commission quoted *F.C.C. v. Sanders Bros. Radio Station,* 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 869 (1940):

and not function as common carriers.[17] *Policy Statement, supra,* 60 F.C.C.2d at 859–61. Second, the administrative record—in particular a Commission staff study appended to the *Policy Statement*—demonstrated that competition was highly effective in producing format diversity. Competition, in the Commission's view, has resulted in an "almost bewildering array" of formats in major markets, *id.* at 863, and has facilitated listener choice among stations broadcasting the same format, *id.* at 863–64; conversely, regulation under *WEFM* would probably deter innovative programing. *Id.* at 865. Third, administering *WEFM* would pose vexing administrative problems: formats are difficult to categorize and the costs of a hearing would be enormous, particularly since the doctrine applies logically in license renewals as well as in assignment applications. *Id.* at 861–63, 864–65. Finally, *WEFM* improperly invaded First Amendment interests by chilling broadcasters' programming choices and by imposing an obligation to continue service. In short, *WEFM* would impose "comprehensive, discriminating, and continuing state surveillance,"[18] which the Commission believed

> would be flatly inconsistent with our understanding of congressional policy as manifested in the Communications Act,

> Congress intended to leave competition in the business of broadcasting where it found it, to permit a licensee who was not interfering electrically with other broadcasters to survive or succumb according to his ability to make his programs attractive to the public.

**17.** 60 F.C.C.2d at 859–60, *citing* § 3(h) of the Act, 47 U.S.C. § 153(h), set forth at note 36 *infra.*

**18.** 60 F.C.C.2d at 865, *citing Lemon v. Kurtzman,* 403 U.S. 602, 619, 91 S.Ct. 2105, 2114, 29 L.Ed.2d 745 (1971).

**19.** Commissioner Robinson wrote a separate statement endorsing the majority opinion and reiterating his view that *WEFM* imposed unfair burdens on the licensee proposing to abandon a unique format. He also added a word about the proper roles of court and agency:

> Just as the Court doubtless does not intend by this or any other expression to suggest that it has the responsibility for original formulation of communications policy or *de novo* review of Commission actions . . .

contraproductive in terms of maximizing the welfare of the radio-listening public, administratively a fearful and comprehensive nightmare, and unconstitutional as impermissibly chilling innovation and experimentation in radio programming. *Id.* at 865–66.

The *Policy Statement* concluded with a comment on the "partnership" between the Commission and the Court of Appeals. *Id.* at 865, *citing Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 444 F.2d 841, 851–52 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). In the Commission's view, "when such 'partners' come to a point of fundamental disagreement, it is incumbent upon us to take a step back and rethink our entire position if this relationship is to be creative rather than destructive." 60 F.C.C.2d at 865. The Commission contended that in the present docket it had engaged in such a reconsideration; by implication, it requested this court also to take a step back and rethink our *WEFM* decision. However, the Commission vowed to implement fully *WEFM*'s specific mandate that a hearing be held in that case. Further, it stayed implementation of its "new policy" until the completion of judicial review thereof. *Id.* at 866.[19]

> so it should not be understood by our action here that we construe this partnership notion to give us the right to overrule the Court's mandate. While we draw on this partnership concept to support our firm expression of independent views on this matter contrary to those of the Court of Appeals, I trust all will recognize that we do so in the respectful posture of a junior partner who knows how to march once the marching orders have been authoritatively pronounced—once and for all.

60 F.C.C.2d at 883.

Commissioner Hooks dissented because "the majority does not provide a mechanism to ensure service to significant minority tastes and needs if market forces do not." *Id.* at 882. He believed it incumbent on the Commission to make an especially searching examination of license assignment proposals involving loss of unique formats, and reiterated his belief that the Commission could adopt an approach to implementing the *WEFM* decision that minimized its intrusive features.

The Commission attached two appendices to its *Policy Statement.* Appendix A was a summary of the comments pro and con on the various issues raised by the *Notice of Inquiry.* Appendix B was a staff document, prepared after the close of the comment period, which argued on theoretical and empirical grounds that *WEFM* was not superior to the free market and that competition among licensees had resulted in a high degree of format diversity. Using statistical techniques to test the hypothesis that format type has no effect on audience ratings—*i. e.,* roughly, that the degree of variation in audience share among stations programing the same format was as great as the variation among stations programing different formats—the staff concluded that, although format type did have a statistically significant impact on audience share, the magnitude of that impact was small. In the staff's view, this study demonstrated *WEFM* 's "decisive flaw" in assuming that duplication of stations within a format is wasteful in terms of listener satisfaction. *Id.* at 873.

On August 25, 1977, the Commission refused to reconsider the *Policy Statement. Denial of Reconsideration, supra.*[20]

## II

Although the Commission claims to have taken a "step back" and impartially reexamined the issue, its treatment of the format decisions, and of citizens groups seeking to enforce them, has been such as to cast serious doubt on the rationality and impartiality of its action. Two facets of the *Policy Statement* stand out in this connection: the Commission's reliance on a previously undisclosed staff study, and its contention that enforcing *WEFM* would be an "administrative nightmare."

### A.

Even a brief perusal of the *Policy Statement* reveals that the staff study, which was issued as Appendix B thereto, had a major influence on the decision. The Commission cited it in the body of the *Policy Statement* as showing "decisively . . . how effective the tool of competition has been in carrying out Congress' plan for entertainment programming";[21] as supporting the conclusion that "the marketplace is the best way to allocate entertainment formats in radio";[22] and as strongly indicating that listeners carefully discriminate among stations programing the same format.[23] In view of the study's importance, we might have expected that, before reaching a decision, the Commission would release it for adversarial testing of its data base, methodology, and conclusions. *See generally United States v. Nova Scotia Food Products Corp.,* 568 F.2d 240, 251–52 (2d Cir. 1977); *Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 486 F.2d 375, 392–94 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 427–29, 478 F.2d 615, 631–33 (1973). Yet it appears that, prior to the issuance of the *Policy Statement,* only the Commission itself knew of the study's existence.

The Commission's failure to disclose this important technical document for public comment not only diminishes the assurance that its decision is substantively accurate, but also raises questions of procedural fairness to the parties opposed thereto. Aggravating the procedural aspect in the present case are certain statements made by the Commission in response to inquiries from citizens groups. Several times during the comment period, for example, petitioners requested the Commission to contract for an independent study of format diversity, J.A. at 145, 153; *id.* at 160, 161; *id.* at 237,

---

**20.** Commissioner Fogarty, a recent appointee, concurred "to the extent [the *Denial*] respectfully seeks further judicial guidance," 66 F.C.C.2d at 86, but expressed "basic agreement" with the thrust of *WEFM.* Commissioner Hooks dissented without opinion.

**21.** *Policy Statement, supra,* 60 F.C.C.2d at 861.

**22.** *Id.* at 863.

**23.** *Id.*

238. Petitioners argued that the *Notice of Inquiry* lacked a sufficient data base, that the industry-commissioned studies filed during the comment period were biased, and that petitioners did not have the resources to fund their own studies. The Commission denied these requests on February 19, 1976, and May 24, 1976, J.A. at 164, 169, *id.* at 247, 248. On March 29, 1976—four months before the issuance of the *Policy Statement* —the Commission's Broadcast Bureau responded to a Freedom of Information Act request for "all data, reports and memoranda utilized or proposed to be utilized by the Commission in this proceeding," J.A. at 48, without indicating that it planned to use a staff study in deciding the *Inquiry.* Although perhaps accurate when made, these statements created the somewhat misleading impression, which the Commission could usefully have corrected, that no studies would be undertaken.

The Commission argues that the parties had an adequate opportunity to comment on the study on petition for reconsideration. The heavy burden on any petitioner for reconsideration, however, surely makes the opportunity to comment at this stage a less than adequate substitute for the chance to influence the Commission's initial decision. That the Commission was not open-minded at this stage is evident from the record. It apparently required a Freedom of Information Act request for petitioner Citizens Communications Center to obtain a description of the methodology used in preparing the study. J.A. at 68–87. This description was provided on September 15, 1976, two weeks after the expiration on the time period for reconsideration petitions.

Even if we accepted at face value the Commission's representation that it would have considered a request for reconsideration filed out of time if based on newly-disclosed material, our misgivings would not be fully assuaged. The Commission's Freedom of Information Act response contained computer worksheets which were obscure if not incomprehensible to readers lacking a key to the meaning of the figures. Citizens Communications Center requested such a key in a letter to the Commission dated March 22, 1977. J.A. at 100–100A. The Commission's response, which contained such a key, see J.A. at 573–75, was apparently sent only to the Citizens Communications Center and not to other petitioners as might have been expected had the Commission acted out of a good faith desire to obtain comments on the study. Some petitioners claim that the first they knew of this key was when the Commission designated it for inclusion in the Joint Appendix filed in this court. In short, it is open to serious question whether even after issuance of the *Policy Statement* the petitioners were given information about the study's design and data base sufficient to allow meaningful comment thereon, and whether, if such comment had been feasible, the Commission would have received it with an open mind.[24]

### B.

One of the Commission's principal grounds for repudiating the format decisions was the contention that implementing them would be an "administrative nightmare," imposing "enormous costs on the participants and the Commission alike."[25] The hearing on remand from the *WEFM* decision, which was said to be "fairly typical" of format abandonment proceedings, involved the following:

[A]n administrative law judge held two prehearing conferences in Washington, D.C.; his preparation time was an additional eight hours. In addition the Broadcast Bureau trial staff spent above two hundred man-hours of preparation

---

24. Petitioners urge this defect as an independent ground for overturning the Commission. We agree that the study does raise serious questions about the overall rationality and fairness of the Commission's decision. However, because certain broader defects, of which the study is symptomatic, are fatal to the Commission's action, we need not decide whether the failure to obtain public comment on the study is itself of sufficient gravity to warrant rejection of the *Policy Statement.*

25. 60 F.C.C.2d at 865, 864.

time. Subsequently, hearings were held on nine separate dates in Washington, D.C., and on nine different dates in Chicago, from which a transcript of 3120 pages was compiled. Following the hearings, the Broadcast Bureau spent two hundred and forty hours preparing proposed findings of fact and the administrative law judge will have spent approximately two hundred and eighty hours preparing his initial decision.[26]

The Commission was particularly concerned with the burden of such hearings because, in its view, they would also be required when a licensee that had changed its format mid-term (without transferring the license) applied to the Commission for license renewal.[27]

While we do not wish to minimize the burdens of a format abandonment hearing, the truth is that in the sunlight of the facts the Commission's "administrative nightmare" turns out to be little more than a dream. The Commission professes that it has sought in good faith to administer format changes ever since the *Atlanta* decision in 1970. An examination of the actual burdens imposed on the Commission by the cases that have reached this court during that period—all involving license assignment applications—is highly instructive.

In *Atlanta,* this court reversed the Commission's approval without a hearing of a license assignment involving a change from classical music to a " 'blend of popular favorites, Broadway hits, musical standards, and light classics,' " 141 U.S.App.D.C. at 111, 436 F.2d at 265, and remanded the case for an evidentiary hearing on the alleged unprofitability of the existing operation, the accuracy with which views of prominent citizens were represented, and the degree to which listeners were provided with classical music from other broadcast sources. However, no hearing was held on remand because the parties settled the matter among themselves. In *Progressive Rock* we re-

manded a case involving a proposed shift from "progressive rock" to "middle of the road" for a hearing on the issues of financial viability and alternative sources of the format. Again the parties apparently settled the dispute and no hearing was held. In *Lakeland,* a case involving a proposed switch from "all-news" to "country and western," we found no substantial dispute over the issues of financial viability and alternative sources of the format, and hence upheld the Commission's approval of the application without a hearing.

Finally, in *WEFM,* we remanded a case involving a switch from classical to rock music for a hearing on the questions of financial viability, accuracy of community leader surveys, and availability of alternative sources. A hearing was held, and the Administrative Law Judge issued an initial decision proposing to grant the application. *Zenith Radio Corp.,* F.C.C. 76D–47 (1976), 76D–46 (1977). Subsequently, however, the parties agreed to a settlement in which the petitioner to deny agreed to withdraw its objection in exchange for certain actions designed to strengthen alternative sources of classical music in the listening area. The Commission approved the settlement. *Zenith Radio Corp.,* F.C.C. 78–102, 42 Pike & Fischer Radio Reg.2d 472 (1978).

In light of this history, the Commission's fears appear somewhat less than realistic. In nearly ten years, a mere handful of format change cases have reached this court. Of these, one—*Lakewood*—resulted in the Commission's being affirmed on grounds indicating that in many cases no hearing would be required. Two—*Atlanta* and *Progressive Rock*—were remanded but were settled before a hearing could be held. In the entire history of the format cases, only *one* case—*WEFM*—has resulted in a hearing; and even this was settled prior to administrative appellate procedures. The hearing that did occur, although by no means inconsequential in scope, was nevertheless less extensive than the typical com-

---

**26.** *Id.* at 864–65.

**27.** *Id.* at 861.

parative renewal proceeding.[28] Nor does the burden promise to be significantly greater in the future. At oral argument, the Commission's counsel, upon inquiry from the bench, estimated that "perhaps half a dozen" petitions to deny based on format changes were then pending. If past experience is a guide, few, if any, of these will eventuate in a hearing.

The Commission also argues that the administrative burden is excessive because format hearings will be required in the renewal as well as the transfer context. We do agree that the format cases logically apply to renewal applications.[29] But we do not believe that renewals will open the floodgates to the administrative hearing room, because the safeguards against excessive numbers of hearings are as present in the renewal context as in the assignment context. No hearing will be required on a renewal application if the abandoned format is financially unviable, if it is not unique in the listening area, or if there has been an insufficient outpouring of public protest against the change.

Apparently recognizing its untenability, the Commission's counsel, at oral argument before us, conceded that the "administrative nightmare" characterization was an "exaggeration" and personally assured the court that the argument was not "very significant at all" to the Commission's decision. Yet this concession does not retroac-

tively make rational the Commission's ill-advised reliance on the issue. And we cannot but view with considerable suspicion an administrative agency's decision that lays such stress—to the point of almost frenzied rhetorical excess—on an argument which, in light of the actual facts, appears so lacking in merit.[30]

### III

The staff study and administrative nightmare issues are merely the most striking examples of certain more pervasive problems. Throughout the format controversy, the Commission has displayed a deep-seated aversion to the decisions of this court (and to the advocates of those decisions) while at the same time misinterpreting and exaggerating their meaning. Perhaps as a result of these interrelated defects, the Commission failed to take affirmative steps to minimize what it perceived as the intrusive features of the format decisions while preserving their essence.

### A.

It has been evident from the start that the Commission's response to the format decisions would be something less than enthusiastic cooperation. Professing time and again that entertainment programing is very broadly, if not wholly, committed to licensee discretion,[31] the Commission has

---

28. *See* Note, Judicial Review of FCC Program Diversity Regulation, 75 Colum.L.Rev. 401, 406 n. 33 (1975).

29. By the same logic, however, *WEFM* does not apply to format changes made mid-term by the licensee, except insofar as such changes are placed in issue at renewal time.

30. The "administrative nightmare" argument calls to mind an earlier controversy in which similar contentions were made. *See Office of Communication of United Church of Christ v. FCC,* 123 U.S.App.D.C. 328, 359 F.2d 994 (1966); *Office of Communication of United Church of Christ v. FCC,* 138 U.S.App.D.C. 112, 425 F.2d 543 (1969); text at pp. ——-—— of 197 U.S.App.D.C., at pp. 851–852 of 610 F.2d *infra.*

31. In the administrative decisions and briefing to this court in the *Atlanta* case, the Commis-

sion argued repeatedly that if the proposed format serves a significant audience segment then a determination to use that format is a judgment for the broadcaster to make, not the Commission. *Atlanta, supra,* 141 U.S.App.D.C. at 115, 436 F.2d at 269; Glenkaren Assocs., Inc., 14 Pike & Fischer Radio Reg.2d 104, 105–06 (1968) (initial decision); 19 F.C.C.2d 13, 15 (1969) (denial of reconsideration). We rejected this argument in *Atlanta,* 141 U.S.App.D.C. at 118, 436 F.2d at 272.

Our *Atlanta* decision, however, did not deter the Commission from pressing its belief in licensee discretion in later cases. *See* Charles A. Haskell, 36 F.C.C.2d 78, 87 (1972), *aff'd on other grounds, Lakewood, supra* (public interest "best served by not hampering a licensee's flexibility in choosing or changing formats"); Twin States Broadcasting, Inc., 35 F.C.C.2d 969, 971 (1972), *rev'd, Progressive Rock, supra* (format choice "primarily in the discretion of

never initiated a hearing in a format change case and has repeatedly urged this court to reverse or drastically. curtail the decisions.[32] And it instituted the present proceeding in the nature of rulemaking with the apparent purpose of overruling the *WEFM* case. Whatever its power generally to proceed by rulemaking rather than adjudication, we think it a somewhat different matter when the seeming purpose of the rulemaking is the circumvention of a recent court decision reached in an adjudicatory context.

These misgivings are not allayed by the record of the present proceeding. It hardly requires a literary critic to discern that the *Notice of Inquiry's* "questions" about *WEFM* were for the most part rhetorical. Those favoring *WEFM* could not have been heartened to read of the Commission's "deep[ ] concern[ ]" that *WEFM* "may lead only to expense, delay and stagnation, with no assurance that a decision finally reached by the Commission would be in any sense superior to that favored by the marketplace," and that the decision might cause "serious adverse consequences for the public interest." 57 F.C.C.2d at 582, 584, 582. The indications in the *Notice of Inquiry* that the Commission would not give pro-*WEFM* comments due consideration were borne out by later events. Its *Policy Statement*, as we have noted at length, relied heavily on a staff study which had not been

placed in the record for public comment. Moreover, the Commission ignored completely comments which it had solicited, *see* note 14 *supra,* concerning how *WEFM* could effectively be administered.[33]

### B.

Closely related to the Commission's innate aversion to our format decisions is its sometimes drastic misreading of those cases. It analyzed the problem in stark terms: formats are to be chosen *either* by market forces *or* by "the alternative to the imperfect system of free competition . . . a system of broadcast programming by government decree." *Denial of Reconsideration, supra,* 66 F.C.C.2d at 81. *WEFM,* in the Commission's view, is the antithesis of the free market: it mandates a "system of pervasive governmental regulation," *Notice of Inquiry, supra,* 57 F.C.C.2d at 582, requiring "comprehensive, discriminating, and continuing state surveillance." *Policy Statement, supra,* 60 F.C.C.2d at 865, *citing Lemon v. Kurtzman,* 403 U.S. 602, 619, 91 S.Ct. 2105, 2114, 29 L.Ed.2d 745 (1971).

Having framed its analysis in Manichaean terms, it is not surprising that the Commission found numerous flaws in our format cases. There would no doubt be severe statutory and constitutional difficulties with any system that required intrusive governmental surveillance, dictated pro-

the licensee and unless it is shown or appears to the Commission that the format choice is not reasonably attuned to the tastes and general interests of the community of license, we shall not question the licensee's judgment in these matters"); *id.* at 974 (Commissioner Johnson, dissenting) (majority decision is "clear and direct violation of the law as interpreted by the Court of Appeals"). Similarly, in Zenith Radio Corp., 40 F.C.C.2d 223, 230 (1973) (Additional Views of Chairman Burch), *rev'd, WEFM, supra,* six of the seven Commissioners joined in the view that a station's entertainment program format "is a matter best left to the discretion of the licensee or applicants." Although the Commissioners did promise to take an "extra hard look" at proposals depriving communities of unique formats, 40 F.C.C.2d at 231, this was repudiated in the *Policy Statement* here under review. 60 F.C.C.2d at 866 n.8.

**32.** *See, e. g., WEFM, supra,* 165 U.S.App.D.C. at 199 n.17, 506 F.2d at 260 n.17; *Progressive*

*Rock, supra,* 156 U.S.App.D.C. at 20, 478 F.2d at 930 ("[i]t is our distinct impression . . . based on the briefs and oral arguments . . . that the Commission desires as limiting an interpretation as is possible. We suspect, not altogether facetiously, that the Commission would be more than willing to limit the precedential effect of *[Atlanta]* to cases involving Atlanta classical music stations"); Zenith Radio Corp., 38 F.C.C.2d 838, 845–46 (1972), *reconsideration denied,* 40 F.C.C.2d 223 (1973), *rev'd, WEFM, supra* ("extention of [the *Atlanta* ] holding beyond the limited confines of the facts and circumstances therein would be most unwise").

**33.** *See* J.A. at 206–225 (Comments of WNCN Listeners Guild); *see also id.* at 338–341 (Petition for Reconsideration of Office of Communication of United Church of Christ *et al.*).

graming choices, forced broad access obligations, or imposed an obligation to continue in service under any and all circumstances. Moreover, any system of pervasive regulation of the type envisaged by the Commission would indeed be an "administrative nightmare," a "quagmire" that the agency would be well-advised to avoid.

The truth is that the actual features of *WEFM* are scarcely visible in this highly-colored portrait. As we have emphasized before and repeat today, *WEFM* was *not* intended as an alternative to format allocation by market forces. We fully recognized that market forces do generally provide diversification of formats. The licensee's discretion over programing matters is therefore very broad while the Commission's role is correspondingly narrow.[34] However, we also recognized—as does the Commission—that the radio market is an imperfect reflection of listener preferences. Because broadcasters earn their revenues from advertising, they tend to serve young adults with large discretionary incomes in preference to demographically less desirable groups like children, the elderly, or the poor. *See WEFM, supra,* 165 U.S.App.D.C. at 207, 506 F.2d at 268.

Further, as is clear from our earlier cases, the Commission's obligation to consider format issues arises only when there is strong prima facie evidence that the market has in fact broken down. No public interest issue is raised if (1) there is an adequate substitute in the service area for the format being abandoned, (2) there is no substantial support for the endangered format as evidenced by an outcry of public protest, (3) the devotees of the endangered format are too few to be served by the available frequencies, or (4) the format is not financially viable. *See* text accompanying notes 5–9 *supra.* One or another of these factors is

surely present in most format changes. And generally the existence *vel non* of these factors can be determined without the need for a hearing. The small remainder of cases are simply those in which the evidence strongly indicates that market mechanisms have not satisfied the Communications Act's mandate that radio serve the needs of all the people.

As we have observed in Part II *supra,* the Commission's administrative nightmare argument is seen to have little merit when it is remembered that only one of the handful of format cases reaching this court has resulted in a hearing. Also unpersuasive, in this regard, is the Commission's contention that *WEFM* mandates an unconstitutional, or at least statutorily proscribed, intrusion on licensee programing discretion. The Commission laid particular stress on the argument that licensees will be deterred from experimenting with unusual formats out of a fear of being locked in. But it has provided little or no evidence that *WEFM* has in fact deterred licensees' format choices; quite to the contrary, the Commission's staff study concluded that under the *WEFM* regime licensees have been aggressive in developing diverse entertainment formats.

█ Finally, we must emphasize the narrowness of the Commission's remedial powers. It merely has the power to take a station's format into consideration in deciding whether to grant certain applications. It has no authority under *WEFM* to interfere with licensee programing choices: it cannot restrain the broadcasting of any program, dictate adoption of a new format, force retention of an existing format, or command provision of access to non-licensees. To say that it is empowered to impose censorship[35] or common carrier[36] obli-

---

34. *See Progressive Rock, supra,* 156 U.S.App. D.C. at 19, 478 F.2d at 929 (most format changes do not substantially diminish diversity and thus may appropriately be left "to the give and take of each market environment and the business judgment of the licensee"); *Atlanta, supra,* 141 U.S.App.D.C. at 118, 436 F.2d at 272 (licensee has "considerable latitude in the matter of programming").

35. *See* Communications Act § 326, 47 U.S.C. § 326:

Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio

36. See note 36 on page 852.

gations is to stretch *WEFM* virtually beyond recognition.[37]

## C.

The Commission would likely have been less concerned had it read our format cases more accurately; conversely, it would probably have better interpreted those cases had it viewed them more sympathetically. The flaws in its approach are intimately connected. They intersect in the Commission's failure to implement the cases so as to minimize their drawbacks while preserving their essence. Had it attempted to develop administrative standards instead of simply abdicating, it might well have discovered that many perceived "flaws" could be lessened or eliminated altogether.

The impetus for developing such standards must come, in the first instance, from the Commission. Only it, and not this court, has the expertise to formulate rules well-tailored to the intricacies of radio broadcasting, and the flexibility to adjust those rules to changing conditions. Only it has the opportunity to develop standards of general applicability outside an *ad hoc* adjudicatory context. And only it has the power to determine how to perform its regulatory function within the substantive and procedural bounds of applicable law.

The Commission has not suffered from the want of suggestions along these lines. Scholars have noted that it could develop acceptable guidelines.[38] This court has emphasized the Commission's discretion to develop administrative standards,[39] and stressed that judicial review thereof will be

station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication. This prohibition "has never been construed to deny the Commission the power to review the content of completed broadcasts in the performance of its regulatory duties." *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 3033, 57 L.Ed.2d 1073 (1978).

**36.** *See* Communications Act § 3(h), 47 U.S.C. § 153(h), which provides in pertinent part that "a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier."

The central distinguishing characteristic of broadcast common carriers is that they must provide non-discriminatory public access to their facilities. *FCC v. Midwest Video Corp.*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979); *Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 105–109, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). Nothing remotely resembling public access obligations is involved in the present case. Nor do we find persuasive the other asserted resemblances between *WEFM* and common carrier regulation: it neither obligates broadcasters to "continue in service," regulates the rates charged to advertisers, or prohibits unnecessary duplication of facilities.

**37.** It is also argued by commercial broadcasters that *WEFM* contravenes § 310(d) of the Act, 47 U.S.C. § 310(d), which provides, in pertinent part, that in acting on transfer or assignment applications "the Commission may not consider whether the public interest, convenience, and necessity might be served by the transfer, assignment, or disposal of the permit or license

to a person other than the proposed transferee or assignee." *WEFM* is said to violate this provision by requiring the Commission to compare the qualifications and operations of the assignor with those of the assignee.

This argument was not, however, relied on by the Commission in either of its actions reviewed herein. In any event, § 310(d) by its literal terms would not appear to forbid assignor-assignee comparisons because the license is not "transfer[red], assign[ed], or dispos[ed] of" when it is retained by the existing licensee. This is the position taken by the Commission itself. Wichita-Hutchinson Co., 20 F.C.C.2d 584, 586 (1969) ("[t]he comparison prohibited by [§ 310(d)] is not between the transferor and the proposed transferee but between the proposed transferee and some third person other than the transferee proposed in the application.")

**38.** *See* D. Ginsburg, Regulation of Broadcasting 316 (1979); Note, *supra* note 28, at 436–37.

**39.** *WEFM, supra*, 165 U.S.App.D.C. at 207 n.35, 506 F.2d at 268 n.35; *id.* at 208 n.4, 506 F.2d at 269 n.4 (Bazelon, C. J., concurring in the result); *Lakewood, supra*, 156 U.S.App.D.C. at 15 n.14, 478 F.2d at 925 n.14 ("we have never attempted to set out specific guidelines for achieving the market place ideal. The first, tentative steps into this complex area of regulation must be taken by the Commission"). *Cf. Office of Communication of United Church of Christ v. FCC*, 123 U.S.App.D.C. 328, 339, 359 F.2d 994, 1005 (1966) (suggesting that Commission can avoid administrative burdens of public intervention by formulating appropriate regulations by rulemaking).

limited and deferential.[40] The Commission itself has recognized the need for standard-setting. Commissioner Hooks, concurring in the *Notice of Inquiry,* suggested standards for the sympathetic implementation of *WEFM* ;[41] and the Commission majority, in the same document, requested comments on administering the decision.[42] It is regrettable, from the present perspective, that rather than pursuing this approach the Commission chose simply to throw up its hands. While we cannot, of course, dictate what, if any, standards the Commission should adopt, the following suggests ways in which development of appropriate guidelines could satisfy many of its objectives.

One difficulty noted by the Commission and intervening commercial broadcasters is the alleged impossibility of classifying radio formats. They point to our statement that "we know [a format] when [we hear] it,"[43] as being overly subjective, and to some of the distinctions we have drawn between formats as being nice to the point of administrative infeasibility.[44] Yet these were the judgments of a court forced to decide the case before it by reference to the language of the Communications Act and the Congressional purpose informing it. The Commission, with its greater expertise and broad overview of the subject matter, could arrive by rulemaking at a format taxonomy which, even if imprecise at the margins, would be sustainable so long as not irrational.[45] The Commission "retains a discretion commensurate with its expertise to make reasonable categorical determinations," *WEFM, supra,* 165 U.S.App.D.C. at 204, 506 F.2d at 265. Had it developed a rational classification schema in the first instance, this court would surely have given it great credence even if the results reached thereunder differed from those obtained by application of our own unguided analysis.[46]

Indeed, the Commission used a format classification in its staff study to demonstrate the existence of broad diversity in major radio markets. There is a marked inconsistency in its endorsing the validity of a study largely premised on classifications it claims are impossible to make. In any case, the schema used in the staff study follows accepted industry usage and would appear facially rational. It is likely that the perceived administrative difficulties would be greatly reduced if the Commission were to adopt a similar approach.[47]

40. *Progressive Rock, supra,* 156 U.S.App.D.C. at 25, 478 F.2d at 934; *Lakewood, supra,* 156 U.S.App.D.C. at 12, 478 F.2d at 922. *Cf. Office of Communication of United Church of Christ v. FCC,* 123 U.S.App.D.C. 328, 339–40, 359 F.2d 994, 1005- 06 (1966) (broad discretion to formulate rules governing public intervention).

41. *See* note 15 *supra.*

42. *See* note 14 *supra.*

43. *Atlanta, supra,* 141 U.S.App.D.C. at 111 n.1, 436 F.2d at 265 n.1, *quoting Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).

44. *See WEFM, supra,* 165 U.S.App.D.C. at 204 n.28, 203 04, 506 F.2d at 265 n.28, 264–65 (suggesting distinctions between twentieth century and other classical music and between "fine arts" and "classical"); *Progressive Rock, supra,* 156 U.S.App.D.C. at 22, 478 F.2d at 932 ("progressive rock" distinguished from "top forty").

45. *Cf. Weyerhaeuser Co. v. Costle,* 191 U.S. App.D.C. 309, 351–358, 590 F.2d 1011, 1053–1060 (1978) (upholding EPA's classification of paper mills into sixteen categories for purpose of setting effluent limitations).

46. *Cf. National Ass'n of Indep. Television Producers and Distribs. v. FCC,* 516 F.2d 526 (2d Cir. 1975) (upholding Commission's classification of television programs into "public affairs," "documentary," and "children's" as part of prime time access rule).

47. Furthermore, the Commission is not precluded from experimenting with more innovative approaches. It might consider, for example, dispensing altogether with the need for classifying formats by simply taking the existence of significant and bona fide listener protest as sufficient evidence that the station's endangered programing has certain unique features for which there are no ready substitutes in the service area. In other words, the Commission could dispense with the requirement that the endangered format be demonstrably "unique." This approach would obviate the need for "subjective" distinctions among formats and would respond, also, to the objection that listeners perceive important differences among stations programing the "same" format. And by concentrating on the existence of listener unrest, this approach would focus attention on the essentials of the format doctrine, namely, that when a significant sector of the

With regard to *WEFM*'s perceived intrusiveness, the Commission could set rigorous standards as to when petitioners to deny have established a prima facie case. It could, for example, require a relatively high level of public grumbling, could classify formats into broader rather than narrower categories, and could place the burden of demonstrating "uniqueness" on the petitioners.[48] To deal with the "lock in" problem it could exempt from the hearing requirement formats adopted experimentally and sought to be abandoned after a very short period of time.

In the analogous context of the fairness doctrine, the Commission has adopted stringent prima facie case requirements that weed out, at the outset, the great majority of complaints. We recently upheld, *en banc*, the Commission's dismissal of a fairness doctrine complaint based on those rigorous standards. *American Security Council Education Foundation v. FCC,* 197 U.S.App.D.C. 124, 607 F.2d 438 (1979). We noted that the prima facie evidence requirement served to protect delicate First Amendment values by ensuring that robust, wide-open debate would not be deterred. Like the fairness doctrine, the format cases involve the Commission in an area charged with sensitive First Amendment implications. The Commission could surely use a similar technique in the format context for accommodating First Amendment values to the fact that broadcasters, under the scheme of the Communications Act, are public trustees obligated to serve the public interest.[49]

None of this is to imply, however, that the Commission is free to "administer" the format cases as a dead letter.[50] Whatever administrative means the Commission adopts must be capable of identifying and rectifying those infrequent situations in which market allocation *has* failed and in which the public interest would not be served by granting the assignment application. That is the basic message of our format change cases as to what Congress has willed in these situations, and it is one we reaffirm today.

## IV

### A.

Because the Commission devoted considerable energy to justifying its view of the proper relationship between court and agency, a few words on the subject are in order here. The Commission repeatedly referred to *WEFM* as representing the "policy" of the Court of Appeals, and contrasted it unfavorably with the "policy" of the Commission. It called upon this court, as its so-called "partner" in the regulatory process, to step back and recognize that its "policy" is superior to our own.

We should have thought that *WEFM* represents, not a *policy*, but rather the *law* of the land as enacted by Congress and interpreted by the Court of Appeals, and as it is to be administered by the Commission. This court has neither the expertise nor the constitutional authority to make "policy" as that word is commonly understood. *See National Broadcasting Co. v. United States,* 319 U.S. 190, 224, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); *Action for Children's Television v. FCC,* 183 U.S.App.D.C. 437, 460–61, 564 F.2d 458, 481–82 (1977); *WEFM, supra,* 165 U.S.App.D.C. at 206–07, 506 F.2d at 267–68. That role is reserved to the Congress, and, within the bounds of delegated authority, to the Commission. But in matters of interpreting the "law" the final say is constitutionally committed

---

populace is aggrieved by a planned programing change, this fact raises a legitimate question as to whether the proposed change is in the public interest.

**48.** *Cf.* J.A. at 220 (comments of WNCN Listeners Guild) (suggesting that petitioning groups should have the burden of making out a prima facie case of uniqueness, although licensee should have burden of proof on the issue).

**49.** *See* D. Ginsburg, *supra* note 38, at 316.

**50.** *Cf. Office of Communication of United Church of Christ v. FCC,* 138 U.S.App.D.C. 112, 425 F.2d 543 (1969) (right of public to intervene in Commission proceedings cannot be vitiated by Commission's hostile attitude towards intervenors).

to the judiciary. *See International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 99 S.Ct. 790, 800 & n.20, 58 L.Ed.2d 808 (1979); *SEC v. Sloan,* 436 U.S. 103, 118–19, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978). Although the distinction between law and policy is never clearcut, it is nonetheless a touchstone of the proper relation between court and agency that we ignore at our peril.

*WEFM* was an interpretation of a statute applicable to an adjudicatory proceeding and, to this extent, was a decision in which the judicial word is final. That decision was based on an interpretation of the Communications Act. Moreover, although we did not explicitly address the constitutional implications of our decision, the constitutional issue was commented upon extensively by Chief Judge Bazelon in his opinion concurring in the result. Suffice it to say that we found no constitutional impediment to the decision as we understood it. As to these constitutional and statutory issues, it was the Commission's obligation to accept and carry out in good faith its legal duties as interpreted by this court.[51]

### B.

Our legal judgments in the earlier cases, however, were grounded in certain factual premises, namely, that there is, in the traditional sense, no free market in radio broadcasting and that in certain circumstances, when there are persuasive indications that market allocation has broken down, the Commission had been given a useful role by Congress to play in ensuring that the benefits of radio accrue to all the people, not simply those favored by advertisers. The Commission, in its staff study appended to the *Policy Statement,* challenged those empirical assumptions. To the extent that the Commission was not questioning this court's legal judgment, but was attempting to demonstrate that faulty factual premises underlay that judgment, we agree that it was within its competence as an agency better equipped to develop legislative-type facts than is this court.

---

**51.** The Commission's reliance on cases beginning with *Banzhaf v. FCC,* 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), *cert. denied,* 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969), is misplaced. In *Banzhaf* we affirmed the Commission's determination that cigarette commercials raised controversial issues of public importance and thus gave rise to fairness doctrine obligations for broadcasters who ran them. In subsequent cases this court followed the *Banzhaf* holding with respect to other types of product advertising. *Retail Store Employees Union v. FCC,* 141 U.S.App.D.C. 94, 436 F.2d 248 (1970); *Friends of the Earth v. FCC,* 146 U.S.App.D.C. 88, 449 F.2d 1164 (1971). The Commission then instituted a general reexamination of the fairness doctrine and concluded that it would no longer apply it to product advertising. Fairness Report, 48 F.C.C.2d 1, 24 (1970). We affirmed the change of policy. *National Citizens Comm. for Broadcasting v. FCC,* 186 U.S. App.D.C. 102, 567 F.2d 1095 (1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978). The Commission argues that we should also permit it to change its mind in the present case and cease enforcing the format decisions.

There is, however, an important difference between when (1) we *uphold* an agency's interpretation of its governing statute and then review its contrary interpretation; and (2) we *reject* an agency's interpretation of its governing statute and then review its reaffirmation of its original interpretation. Because of the deference owed the Commission's construction of the Communications Act, *Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 121–22, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), there is a fairly wide range of interpretations we would uphold on judicial review. In the product commercial cases, both the Commission's positions fell within this range and we were therefore able to uphold both. In the format cases, by contrast, we found from the start that the Commission's interpretation of the Act could not be sustained even when all due deference was given that construction. There is no reason for us to pay any greater deference to the Commission when it makes the same arguments in a subsequent proceeding.

Perhaps recognizing the force of this objection, the Commission attempts to place itself in the first category described above rather than the second: it implies that it originally agreed with the holdings of the format cases and only later determined to change its mind. This argument, however, is belied by the Commission's history of at least passive resistance to the format decisions in the name of licensee freedom. *See* notes 31–32 and accompanying text *supra.*

As we have noted, however, the Commission's use of the staff study was infected with the serious flaw that it never even divulged the existence of the study, much less gave the participants the opportunity to comment thereon, before issuing its *Policy Statement.* This procedural unfairness, coupled with the substantive uncertainty flowing from the lack of adequate adversarial testing during the comment period, is enough to make us view skeptically the Commission's use of the study. But even if we were to accept the study on its own terms, we would not be persuaded.

The study consisted of two parts. In the first, the Commission staff compiled a chart showing which of 18 format types were available in the 25 largest radio markets. From this, the Commission argued that an adequate degree of diversity was currently being achieved by market forces. Second, the staff performed a statistical analysis of the relationship between the format type programmed by a station and its audience share as a rough measure of the degree to which stations programing the "same" format are considered by consumers to be close substitutes for one another. The staff found that the variation of audience shares within a given format was nearly as great as the variation among formats, and concluded that stations programing the same format were not necessarily close substitutes for one another. From this the Commission argued that it was not true, as we had supposed in *WEFM,* that abandonment of a unique format in favor of a format already present in the service area strongly indicated a loss in overall diversity.

The first part of the study, in our view, is completely consistent with *WEFM.* That

case recognized that market allocation is generally an adequate guarantor of format diversity; it requires the Commission to step in only when there are persuasive indications that market allocation has failed in a particular case. *WEFM,* we repeat, was aimed not at the probable majority of cases in which the market operates adequately, but as those perhaps infrequent cases in which it has not done the job. The study does not show that the market functions adequately in every instance.[52] Indeed, the Commission admits that market allocation is an imperfect reflection of audience preferences.

The second part of the staff study challenged the proposition that the Commission can—and must if it is to be faithful to the Act it administers—sometimes do a better job than the imperfect market. The Commission, as we have noted, viewed *WEFM* as mandating a system of pervasive governmental format allocation antithetical to the free market. If this were the meaning of *WEFM,* we would certainly agree that it could not improve on market allocation. But when it is recognized that *WEFM* contemplates governmental action as a supplement, not a substitute, for the market, and when attention is focused on cases of prima facie market breakdown, as in the *Atlanta* case, it seems far more likely that the Commission could usefully play a limited corrective role.

Nor are we convinced by the study's statistical analysis. It is not surprising that one station, by dint of stronger signal, more pleasing announcers, better tempo, superior technical quality or other factors, should gain a much greater market share than

---

**52.** It could be argued, in fact, that by examining only the nation's 25 largest radio markets (which presumably display the greatest degree of diversity) the staff presented a distorted picture of the extent of diversity in the country as a whole. We might also note that even in these major markets important formats are shown as unavailable in the listening area. For example, apparently no classical music service is provided in 7 of the 25 markets. *See* 60 F.C.C.2d at 875–79. Conversely, the study shows a high degree of format duplication in the markets studied.

It is a useful corrective to focus, not on the broad range of cases in which the market functions accurately, but on those infrequent cases in which it appears that it has failed to promote diversity and that the Commission could remedy the defect. One need only think of the *Atlanta* case. Although 16% of the listeners preferred classical music, what was allegedly the only classical format was being abandoned in favor of music which was already programed by several of the 20 stations in the service area. In such a situation, it is evident that market forces may not be serving the public interest.

another station programing the same format in the service area. What would be surprising, however, is if listeners, deprived of their favorite station, were indifferent as to whether they switched to another station programing the same format or to a different format altogether. The common sense of it is that most lovers of disco will switch to another disco station in preference to classical, all-news, country and western or the like. When a unique format is abandoned, those loyal to that format have no adequate substitute in the service area; when a non-unique format is eliminated, its listeners will generally have an adequate substitute in other stations programing the same format.[53] For this reason abandonment of a unique entertainment format raises the special public interest issue treated by our format cases.

Once again the court confronts a problem deriving, in the last analysis, from the common and undivided ownership of the airwaves by all of the people. In *Office of Communication of United Church of Christ v. FCC*, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966) and *Office of Communication of United Church of Christ v. FCC*, 138 U.S.App.D.C. 112, 425 F.2d 543 (1969), this court, in two vigorous opinions by Judge (now Chief Justice) Burger, dealt with a Commission reading of the Act that denied standing to oppose license renewal to all except competing licensees claiming either electrical or economic interference. The first such opinion, at the instance of members of the listening public who wished to be heard on the asserted inadequacies of the licensee's programing, demolished that incredibly restrictive interpretation of the Act's "public interest, convenience, and necessity" standard. The second opinion overturned a rejection of the petition to deny after a hearing and decision on remand which it characterized as positively hostile to the complainants.

In *United Church of Christ*, as here, the Commission asserted all manner of difficulties with the interpretation of the statute pressed upon it by the protestants, including notably severe administrative burdens hampering the discharge of its regulatory responsibilities, if objections to format abandonment were required to be entertained and, where substantial, explored in evidentiary hearings. The Commission's *Policy Statement* in issue here is strongly reminiscent of the attitude displayed by it in *United Church of Christ*. The Commission, despite its parade of horribles in that case, has obviously survived.

In *WEFM* the court was at considerable pains to make clear that it was speaking solely in the context of the current regulatory scheme laid down by Congress. The result reached, we said,[54]

cannot be otherwise when it is remembered that the radio channels are priceless properties in limited supply, owned by all of the people but for the use of which the licensees pay nothing. If the marketplace alone is to determine programming format, then different tastes among the totality of the owners may go ungratified. Congress, having made the essential decision to license at no charge for private operation as distinct from putting the channels up for bids, can hardly be thought to have had so limited a concept of the aims of regulation. In any event, the language of the Act, by its terms and as read by the Supreme Court, is to the contrary.

There is much talk at the moment of deregulation in the communications field, particularly with respect to radio. Bills of varying sweep to this end are pending in the Congress,[55] and the enactment of at least one of them in its present form would appear largely to eliminate for the future

---

53. We have also suggested, in note 47 *supra*, that the Commission could experiment with regulatory approaches responsive to the argument that listeners perceive important differences among stations programing the same format.

54. *WEFM, supra*, 165 U.S.App.D.C. at 207 n.34, 506 F.2d at 268 n.34.

55. *See* H.R.3333, 96th Cong., 1st Sess. (1979); S.611, 96th Cong., 1st Sess. (1979); S.622, 96th Cong., 1st Sess. (1979).

the problem presented in the case before us.[56] But the movement towards regulation by the marketplace appears to be accompanied by the exaction for the first time of charges for the use by licensees of the publicly-owned channels, and the benefits thereof would accrue equally to all members of the owning public.[57] This would be a vast and significant departure from the present system by reference to which we decide the question presently before us.

■■■ Looking to the Act in its present form, we hold the *Policy Statement* under review to be unavailing and of no force and effect.

*It is so ordered.*

BAZELON, Circuit Judge, concurring in vacating the decision:

I concur in vacating the decision of the FCC. The Commission's failure to make public the staff study that proved so central to its final decision violates fundamental rulemaking principles.[1] As the majority opinion documents,[2] the FCC exhibited an almost cavalier disregard for the public's right to comment on the critical data and methodology supporting the Commission's finding that "market forces had provided a significant even if not perfect amount of diversity."[3] This conclusion in turn is a vital link in the Commission's reasoning underlying its adoption of the *Policy Statement.* I believe therefore that the record must be reopened to permit meaningful public participation in the Commission's decision.

Because the Commission's procedural unfairness requires vacating the rule, I would not reach the merits of the FCC's interpretation of the public interest standard as applied to the abandonment of a so-called distinctive or unique format. But since the majority has precluded the FCC from adopting a rule contrary to the decision in *WEFM,* I feel compelled to note my agreement with much of Judge Tamm's thoughtful dissent. Implementing the public interest standard calls for a strong dose of policy judgment, a responsibility entrusted by Congress to the FCC.[4] Yet the majority

**56.** The bill presently given the best change of passage, H.R.3333, *supra* note 55, could well be read to make the present controversy moot. This would grant radio licenses for an indefinite period (*i. e.,* in perpetuity), *id.* § 471(a), and would allocate new or revoked radio licenses among competing applicants by a lottery system, *id.* § 415(d). It would still be necessary to make application for license assignment to the Commission, which must find that "the purposes of this Act will be served" thereby, *id.* § 421; the purposes of the bill, however, are stated to be that "the public interest is best served [by] marketplace forces, rather than government regulation . . . except that, where it has been determined that marketplace forces are deficient, the Congress finds that government regulation in the public interest is necessary and appropriate." *Id.* § 411.

S.622, *supra* note 55, also promises to alter the statutory scheme so as to reduce or eliminate the present controversy. Like H.R.3333, it would make radio license terms indefinite, *id.* § 332(a), and would allocate new licenses by lot, *id.* § 331. It recites a congressional finding that "marketplace competition can be the most efficient regulator of the provision of telecommunications services," *id.* § 2(a)(2), and would prohibit the Commission from requiring radio broadcasters to "adhere to a particular programing format," *id.* § 333(a)(1).

S.611, *supra* note 54, adopts a more limited approach. It would grant radio licenses for an indefinite term, *id.* § 301(a), but provides for annual Commission review of randomly selected stations to determine if their operations are consistent with the public interest, convenience and necessity, *id.* § 301(b).

**57.** H.R.3333, *supra* note 55, at § 414. S.611, *supra* note 55, at § 106, would impose a much more moderate fee on radio broadcasters; and S.622, *supra* note 55, at § 6, would charge a fee based only on the Commission's costs.

**1.** "It is not consonant with the purpose of a rulemaking proceeding to promulgate rules on the basis of . . . data that, [in] critical degree, is known only to the agency." *Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 336, 486 F.2d 375, 393 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

**2.** Majority op. at ———— of 197 U.S.App. D.C., at 846–848 of 610 F.2d.

**3.** FCC Br. at 18; *see* Memorandum Opinion and Order, 60 FCC 2d 858, 863 (1976).

**4.** In *National Citizens Committee for Broadcasting v. FCC,* 181 U.S.App.D.C. 1, 555 F.2d

virtually confines the FCC to a spectator's role in formulating policies that will promote and preserve diversity while minimizing the hazards of government intrusion into the content of broadcasting.

Even apart from this unwillingness to give appropriate deference to the Commission's judgment, I would remain troubled by the route taken by the majority. As I explained at some length in *WEFM*,[5] regulation of entertainment formats is not content neutral. The regulator is inevitably led to favor some forms of expression over others.[6] The majority acknowledges the "sensitive First Amendment implications"[7] of government oversight of format choice, but fails to grapple seriously with the constitutional implications of its decision.

I do not contend that there is a simple resolution to the conflict between fostering diversity, on the one hand, and protecting the media from chilling government interference on the other. The concerns I expressed in *WEFM* continue to plague efforts to regulate the airwaves in the public interest. Perhaps Congress will exercise its

prerogative to cut the Gordian knot and free the choice of format from the bondage of government regulation.[8] Alternatively, the dawning technological revolution may eliminate this dilemma, by opening up an unprecedented number of accessible outlets for speech.[9] For the time being, however, the responsibility for reconciling these interests is lodged with the FCC and, to a limited extent, the courts. The record of fifty years of broadcast regulation suggests that the FCC's affirmative efforts to promote diversity have not only failed to achieve that goal, but have entangled the Commission and the courts in perilous government oversight of the content of expression. I cannot so easily reject the FCC's decision to turn away from this troubling experience and to cast its lot with the marketplace.

LEVENTHAL, Circuit Judge:

I concur in Judge McGowan's excellent opinion for the court.

As sponsor of the court-agency partnership concept and "hard look" doctrine,[1] I

---

938 (1977), *rev'd* 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978), a panel of this court reversed the FCC's decision exempting roughly 90% of existing co-located broadcast/newspaper combinations from a rule banning such cross-ownership. We concluded that, on the record developed by the FCC, the Commission had acted arbitrarily and capriciously by limiting divestiture to 16 "egregious" cases. The Supreme Court reversed, suggesting that we had not given sufficient deference to the Commission's judgment. *See* 436 U.S. at 810, 813–815, 98 S.Ct. 2096. If we are directed to defer to the FCC's decision in *NCCB*, which seemed sharply at odds with the FCC's mandate, surely we should be hesitant to overturn the Commission's judgment here, where the Commission's accommodation of the conflicting policy interests is neither irrational nor wholly contrary to the purposes of the Communications Act.

5. *Citizens Committee to Save WEFM v. FCC*, 165 U.S.App.D.C. 185, 215–20, 506 F.2d 246, 276–81 (1974) (Bazelon, C. J., concurring).

6. This problem is not confined to regulation of format choices. *See, e. g., Brandywine-Main Line Radio Inc. v. FCC*, 153 U.S.App.D.C. 305, 352, 473 F.2d 16, 63 (1972) (Bazelon, C. J., dissenting), *cert. denied*, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973).

7. Majority op. at —— of 197 U.S.App.D.C., at 854 of 610 F.2d.

8. As the majority notes, legislation proposing deregulation of radio is now pending before Congress. *See* majority op. at —— –— & nn.55, 56, of 197 U.S.App.D.C., at 857–858 & nn.55, 56 of 610 F.2d.

9. *See generally* Baer, *Telecommunications Technology in the 1980's*, in Communications for Tomorrow Policy Perspectives for the 1980's 61 (G. Robinson ed. 1978).

1. *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 392–95, 444 F.2d 841, 850–53 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); *see also, e. g., Niagara Mohawk Power Corp. v. FPC*, 126 U.S. App.D.C. 376, 383 n.24, 379 F.2d 153, 160 n.24 (1967); *Public Serv. Comm'n of N.Y. v. FPC*, 167 U.S.App.D.C. 100, 117, 511 F.2d 338, 355 (1975).

These opinions rely, *inter alia*, on *United States v. Morgan*, 307 U.S. 183, 191, 59 S.Ct. 795, 83 L.Ed. 1211 (1939); *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); Stone, *The Common Law in the United States*, 50 Harv.L.Rev. 4, 16–18 (1936); L. Jaffe, Judicial Control of Administrative Action vii (1965).

add a few words to underscore his observation that this court does not view itself as cast in the role of policymaker.

The court explicitly acknowledges its responsibility not to treat the agency as "a hostile stranger,"[2] or "with a hostile eye, like an 'intruder'."[3] In a working partnership, there may be differences between partners, but there is a mutuality of recognition and respect far removed from the approach taken with any stranger or intruder.

The relationship of court and agency emerges from the functions assigned by Congress to each. Congress has delegated to the agency, here the FCC, the function of making policy. It has given the court the role of review to ensure that an agency decision stays within the intent of the law, and satisfies the requirement of reasoned decisionmaking delineated in Justice Harlan's *Permian* opinion.[4]

If hostility to a result leads an agency systematically to distort the testimony of witnesses on material matters, a court could not conscientiously sustain the agency decision.[5] That is not unlike what the Commission has done in this case by distorting the meaning of our *WEFM* opinion,[6] a matter Judge McGowan develops with some care. The court-agency partnership depends on mutuality of respect and understanding.

A court must review an agency's action in terms of what the agency says it has considered.[7] We cannot say that what an agency says it relies on was really unimpor-

tant merely because its appellate counsel attempts some repair carpentry.[8]

TAMM, Circuit Judge, with whom Mac-KINNON, Circuit Judge, concurs, dissenting:

I respectfully dissent. The majority's decision, I fear, usurps the proper role of the Federal Communications Commission (Commission) in the formulation of communications policy. In my view, the Commission's determination that application of *Citizens Committee to Save WEFM v. FCC (WEFM)*, 165 U.S.App.D.C. 185, 506 F.2d 246 (1974) (en banc), will not measurably increase diversity of entertainment formats is neither arbitrary nor capricious. Although I understand the frustration of reexamining an issue purportedly resolved, I believe that the much touted agency-court partnership is well served by continuing dialogue between administrator and judge. I am persuaded that the Commission, which Congress has entrusted with the duty to regulate broadcasting in the public interest, has advanced a reasoned position which this court should uphold.

In *WEFM*, we decided that when an application to transfer a radio license involves a change in format, the Commission must determine whether the assignor's format is unique and financially viable.[1] If so, the Commission, when faced with substantial questions of fact and significant public opposition to the transfer, must conduct a hearing to discern whether loss of the format is in the public interest before acting upon the application.[2]

---

**2.** *Greater Boston, supra* note 1, 143 U.S.App.D.C. at 394, 444 F.2d at 852.

**3.** *Public Serv. Comm'n of N.Y. v. FPC, supra* note 1, 167 U.S.App.D.C. at 117, 511 F.2d at 355.

**4.** *Permian Basin Area Rate Cases*, 390 U.S. 747, 791–92, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

**5.** *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 492–97, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

**6.** *Citizens Committee to Save WEFM v. FCC*, 165 U.S.App.D.C. 185, 506 F.2d 246 (1974) (en banc).

**7.** *SEC v. Chenery Corp.* (Chenery I), 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

**8.** *FPC v. Texaco, Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

**1.** The court noted that an assignor's asserted financial losses will only justify a format change when "those losses [are] attributable to the format itself." *Citizens Comm. to Save WEFM v. FCC*, 165 U.S.App.D.C. 185, 201, 506 F.2d 246, 262 (1974) (en banc).

**2.** 47 U.S.C. § 310(d) (1976) commands the Commission to decide whether an application to transfer a license would be in the public interest. *See also* 47 U.S.C. § 309(a) & (d) (1976).

The *WEFM* court based the hearing requirement on the "public interest in a diversity of broadcast entertainment formats." [3] The court warned that format diversity would not necessarily result from the unregulated play of market forces because broadcasters derive revenue from the sale of time to advertisers, not from the sale of programming to listeners. A station with a larger audience may sell more advertising time, and at higher rates, than a station with fewer listeners. A station with a smaller but more demographically attractive audience may, however, sell as much or more time as the station with greater numbers of listeners. The court feared that the effect of demographics on the radio market would allow listeners with desirable demographic characteristics—typically eighteen- to thirty-year-olds with discretionary income—to exercise a disproportionate influence upon broadcast decisionmakers who choose formats. Because formats preferred by fewer younger people might prove financially more attractive than formats preferred by a greater number of older or lower income listeners, the court concluded that regulation was necessary to insure diversity. The court's reasoning implicitly suggests that regulation is unnecessary if the radio market reflects the desires of the greatest numbers of listeners.

The Commission responded to *WEFM* by instituting a proceeding designed to develop methods for implementing the court's ruling.[4] After reviewing comments of both broadcasters and public interest representatives, the Commission concluded that use of the *WEFM* doctrine would not demonstrably further the public interest.[5]

The Commission did not premise its decision upon a rejection of the court's observation that the presence of demographic considerations might increase the influence of certain listeners.[6] Rather, the Commission first contended that the radio market produces diversity of formats. In support, the Commission presented a study of formats aired in major cities demonstrating "an almost bewildering array of diversity." [7]

Second, the Commission argued that administrative intervention in the format selection process could not be shown to further the public interest.[8] The Commission contended that stations within a given format are not interchangeable to their respective audiences.[9] Simply stated, listen-

---

3. *Citizens Comm. to Save WEFM v. FCC,* 165 U.S.App.D.C. at 201, 506 F.2d at 262.

4. *See Notice of Inquiry, Development of Policy re: Changes in the Entertainment Formats of Broadcast Stations (Notice of Inquiry),* 57 F.C. C.2d 580 (1976).

5. *See Development of Policy re: Changes in Entertainment Formats of Broadcast Stations (Policy Statement),* 60 F.C.C.2d 858, 863–66 (1976).

6. *Id.* at 863.

7. *Id.* The Commission also argued that marketplace allocation accommodates rapidly shifting tastes without the necessity of governmental interference. *Id.* at 864.

8. The Commission stated that determining whether a format change would serve the public interest involved three inquiries: "(1) what the station's existing format is; (2) whether there are any reasonable substitutes for that format in the station's market; (3) if there are not, whether the benefits accruing to the public from the format change outweigh the public detriment which the format abandonment

would entail." *Id.* at 861–62. The Commission suggested that definition of a unique format would present an "acute practical problem." *Id.* at 862; *see* text at —–— of 197 U.S. App.D.C., at 862–863 of 610 F.2d *infra.* Addressing the third question, the Commission stated that it is impossible to determine whether consumers would be better off if a new format replaced a unique format. *Policy Statement,* 60 F.C.C.2d at 862; *see* note 14 *infra.*

The Commission voiced two other notable concerns. First, it suggested that the *WEFM* doctrine may decrease experimentation in formats, because broadcasters would fear being "locked" into a unique format. *Id.* at 865. Second, the Commission thought that format regulation would chill broadcaster's first amendment rights. *Id.* Although I agree that the first amendment concerns are substantial, *see Citizens Comm. to Save WEFM,* 165 U.S. App.D.C. at 207, 506 F.2d at 268 (Bazelon, C. J., concurring), I do not believe the issue need be reached to sustain the Commission's judgment.

9. The Commission documented this reasonable assumption, *see* text at —–— of 197 U.S. App.D.C., at 862–863 of 610 F.2d *infra,* with

ers of a particular station within a format category may not be equally willing to listen to any station within the same format category. The Commission's assumption suggests that, for example, in a two-station market consisting of a top 40 format and a classical format, a second top 40 station might command a greater audience than the unique classical station.[10]

The majority does not dispute the possibility that more listeners may prefer a second top 40 station to a unique classical format. Rather, it suggests that retention of the classical format might be in the public interest because the desires of those preferring the second top 40 station can be easily satisfied by the first top 40 station. Classical tastes, to the contrary, would be less likely satisfied by a top 40 format. The majority explains:

> When a unique format is abandoned, those loyal to that format have no adequate substitute in the service area; when a non-unique format is eliminated, its listeners will generally have an adequate substitute in other stations programing the same format. For this reason abandonment of a unique entertainment format raises the special public interest issue by our format cases.[11]

Thus, the majority introduces a novel doctrine that calculates the public interest without necessary reference to the aural desires of the greatest number of listeners. The majority's approach is fraught with difficulties.

First, WEFM does not require use of the "substitution" theory. The WEFM court noted that the accuracy of listener preferences in the radio marketplace might be distorted by advertisers' quests for demographically desirable audiences. Any demographic effect on the market, however, is cured if the Commission can ascertain the

numbers of people that desire different formats. I harbor serious doubts that regulation based on direct listener "votes" is practicable; but even if it is, the majority, in an effort to justify regulation that may preserve a format favored by fewer listeners than would prefer a changed format, advances the "substitution" principle. Although this theory marks a substantial departure from the reasoning of WEFM, the majority offers no independent support for the principle.

Second, use of the "substitution" theory assumes that "unique" formats can be adequately distinguished from "non-unique" formats. Former Commissioner Glen O. Robinson, in his concurring statement in Notice of Inquiry, 57 F.C.C.2d at 594–95, emphasized the enormity of this task:

> What makes one format unique makes all formats unique. If subjectivity is to be an important determinant of what makes a format "unique" (or, in other terms, what makes it a net contributor to diversity), how are we to avoid the fact that even with respect to formats which objectively seem identical, people—radio listeners—can and do make distinctions. For example, in most large markets there are a number of middle-of-the-road formats which seem identical on any objective or quantifiable basis; yet they are far from interchangeable to their respective audiences. Indeed, if people did not distinguish among these stations, there would be no reason for them to co-exist— and little economic likelihood that they would. Questions of pacing and style, the personalities of on-the-air talent (both individually and in combination with one another) all contribute to those fugitive values that radio people call a station's "sound" and that citizens' groups (and,

---

a study of audience ratings for major radio markets showing that listener preferences are almost as varied within formats as among formats. The Commission concludes that formats of the same type are, therefore, not close substitutes for each other. *Policy Statement*, 60 F.C.C.2d at 863–64, 873–75.

10. According to the majority opinion, the Commission may be called upon to review such a change in format when it considers applications either to transfer or to renew a license. *See* Maj.op., 197 U.S.App.D.C. at ——, 610 F.2d at 838–849.

11. *Id.* at ——, 610 F.2d at 857 (footnote omitted).

alas, appellate judges) call format. It follows, therefore, that by the subjective standards that the Court seems to embrace, any format is unique; from which it follows, all must be preserved. At that thought the mind swims and the heart sinks. (Footnotes omitted).

The majority does not explicitly concede the difficulty of classifying formats according to listener preference. Nevertheless, it suggests that the Commission may dispense with the requirement that an endangered format be demonstrably "unique" for purposes of ordering a hearing.[12] Although the majority's concession neatly sidesteps the difficulty of defining a "unique" format at the pre-hearing stage, it does nothing to ease the Commission's task once a hearing is held.

Third, the "substitution" theory assumes that it is possible for a federal regulatory agency to measure listener preferences in entertainment formats. I would have thought that the best judge of the most desirable entertainment formats is the listening audience itself. When sufficient numbers of top 40 listeners switch channels to patronize another station, which for purposes of federal regulation is also classified as top 40, they must want to hear a "sound" not previously offered. If consumers purchased radio programming, classical listeners could express a greater intensity of

preference simply by paying more than top 40 listeners. Alternatively, if the top 40 listeners intensely preferred a second top 40 station, they could respond by paying even more. Because radio broadcasting is a "zero price" good,[13] however, consumers cannot register their intensity of preference through a price system. "Substitution" as used by the majority is merely a crude device meant to measure the intensity of listener preference.

The "substitution" theory runs afoul of the familiar economic principle that it is either impossible or extremely difficult to compare the intensity of preference of different persons.[14] The range of audience preferences within the same format, for example, suggests that the Commission would be hard pressed to determine how much and how many listeners would prefer a variation of a pre-existing format to a unique format. Given the many aspects of a specific station's "sound," it is difficult to measure the amount or the depth of audience acceptance of a changed format without allowing broadcast of the new format—a solution which eradicates the controversy.

Finally, the majority's "substitution" theory assumes that the Commission will be able to balance number of listeners against intensity of format preference. Consider

12. *Id.* at —— n.47, 610 F.2d at 853 n.47.

13. *See* R. Noll, M. Peck & J. McCowan, Economic Aspects of Television Regulation 32–33 (1973).

14. *See* R. Posner, Economic Analysis of the Law 11 (2d ed. 1977); L. Robbins, An Essay on the Nature & Significance of Economic Science 138–41 (2d ed. 1940). The Commission stated that no economically rational basis exists for comparing intensity of preference among listeners:

In theory preference should be given to that format which is of greater value to the consumers. Unfortunately, the Commission will find it impossible to measure the relative values of different formats because there exists no litmus or *a priori* way of measuring how much particular formats are worth to the audiences. All that can be known is simply how many people listen to available programs.

Unfortunately, the size of a station's audience is not necessarily an appropriate measuring stick of the degree of satisfaction which listeners derive from its programming. That is, two different formats which attract audiences of equal size may not be of equal value. Preferences expressed by the audience of one format may be much stronger than preferences for the other, in which case the former should be the more valuable. In order to ascertain which format is the more valuable, one would have to know the intensity of demand for each. Again, there exists no acceptable, reliable way of measuring aspects of these consumer preferences because consumers are not required to pay for the opportunity to listen to radio.
*Policy Statement*, 60 F.C.C.2d at 873; *see* Bruce M. Owens, "Radio Station Format Changes, Diversity and Consumer Welfare," Appendix to Brief for National Association of Broadcasters.

the top 40/classical format hypothetical. If twenty percent of the listening audience would mildly prefer a second top 40 format and five percent would vigorously prefer retention of the classical format, does the size of one audience outweigh the intensity of preference of the other? The majority opinion offers no clue.

In sum, the majority's opinion presents an unjustified rebuttal to the Commission's conclusion that the public interest may not be discernibly furthered by implementation of the *WEFM* doctrine. The majority has not explained how to decide whether a specific format is unique, how to measure the number of listeners who favor a changed format, or how to compare the intensity of preference between listeners who desire retention of a unique format and those who prefer a variation of a pre-existing format. Finally, the majority has failed to identify the principle within the Communications Act that mandates regulation favoring the interests of fewer listeners over the interests of more listeners.

I am also troubled by another aspect of the majority opinion. The majority notes that petitioners allege that they did not have an adequate opportunity to comment on two studies relied upon by the Commission. The majority explicitly declines to "decide whether the failure to obtain public comment on the study is itself of sufficient gravity to warrant rejection of the *Policy Statement*,"[15] although it says that this "procedural unfairness, coupled with the substantive uncertainty flowing from the lack of adequate adversarial testing during the comment period, is enough to make us view skeptically the Commission's use of the study."[16] On the assumption that the former statement clearly asserts that the majority opinion does not rest upon a procedural ground, I have directed the thrust of these dissenting remarks to the substantive validity of the Commission's decision.

I note in passing, however, that the two statements taken together may be read as suggesting that the alleged procedural unfairness was not serious enough to require a remand to the agency, yet was serious enough to allow the majority to subject the agency to unusually strict scrutiny. In my view, if the majority believes that the Commission has committed procedural error sufficient to alter the normal standard of review of administrative decisions, then a remand to the Commission is proper.[17] A remand would afford the petitioners greater opportunity to comment upon the studies, offer the Commission the opportunity to build a better record for review, and allow this court to meet the Commission's contentions head on.

More important than the specifics of the current debate, is the lack of deference the majority accords the Commission's assessment of market conditions. Although the majority acknowledges the expertise of the Commission to challenge the factual premises that underly the *WEFM* decision,[18] it mounts untested assumption upon untested assumption to create a theory of regulation that may bear little resemblance to the actual functioning of the broadcast market. Only the Commission, equipped with investigatory tools and a well of experience, may predict in the first instance the behavior of listeners and broadcasters. The majority has simply substituted its views for the Commission's.

The Supreme Court has often reminded this court of the appropriate relationship between administrative agency and reviewing court. Only last year, the Court, reversing our finding that the Commission had acted improperly in "grandfathering" certain newspaper-broadcast station combi-

---

**15.** Maj.op., 197 U.S.App.D.C. ―― n.24, 610 F.2d at 847 n.24.

**16.** *Id.* at ――, 610 F.2d at 856.

**17.** *See Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 326–27, 486 F.2d 375, 393–94, (1973) *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *see also South Prairie Constr. Co. v. Operating Eng'rs,*

425 U.S. 800, 805–06, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976); *NLRB v. Food Store Employees,* 417 U.S. 1, 9–10, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974); *FPC v. Idaho Power Co.,* 344 U.S. 17, 22, 73 S.Ct. 85, 97 L.Ed. 15 (1952).

**18.** Maj.op., 197 U.S.App.D.C. at ――, 610 F.2d at 855.

nations, noted that the Commission's decision to adopt a general policy of prospective divestiture was primarily judgmental or predictive. "In such circumstances, complete factual support in the record for the Commission's judgment or prediction is not possible or required; 'a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency.'" *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 814, 98 S.Ct. 2096, 2122, 56 L.Ed.2d 697 (1978) (quoting *FPC v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 29, 81 S.Ct. 435, 450 5 L.Ed.2d 377 (1961)). In the present case, the majority disregards the Commission's expert knowledge and, in so doing, violates the mandate of *FCC v. National Citizens Committee for Broadcasting.*

The majority has lost sight of our role as a reviewing court whose proper function is to uphold an agency's reasonable judgment. The Commission's determination that use of the *WEFM* doctrine will not further the public interest is well within the parameters of reason. Faced with a conflict between judicial and administrative policies,[19] I believe we are obliged to uphold the Commission. The court's decision today, a reversal based on unverified factual assumptions about listener preferences and behavior, extends judicial review of administrative policymaking processes beyond its permissible bounds.[20]

---

**19.** The majority argues vigorously that *WEFM* is *"law"* and not *"policy." See id.* at ——, 610 F.2d at 854. Of course, it is both. The Commission has not asserted that it is free to disregard the mandate of *WEFM,* it simply suggests that the definition of the public interest put forth in that decision is neither the only possible nor the preferable formulation. The majority concedes, as it must, that the public interest standard may subsume different, even opposing, policies. *Id.* at —— n.51, 610 F.2d at 855 n.51. *Compare National Citizens Comm. for Broadcasting v. FCC,* 186 U.S.App.D.C. 102, 567 F.2d 1095 (1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978), *with Banz-*

*haf v. FCC,* 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), *cert. denied,* 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969). Although the Commission's proposal closely tracks an interpretation we have previously rejected, the agency has now presented more persuasive reasons why its view should be upheld. For what purpose is the agency-court partnership if we cannot maintain an open mind?

**20.** *See* Polsby, *F.C.C. v. National Citizens Committee for Broadcasting and the Judicious Uses of Administrative Discretion,* The Sup.Ct.Rev. 1, 17–22 (1979).